3 P.3d 780 (2000)
101 Wash.App. 425
In re the Interests of M.B., J.B., R.H., C.W., D.M., and R.T.
Nos. 41532-8-I, 43014-9-I, 42778-4-I, 42952-3-I, 42923-0-I, 42773-3-I.
Court of Appeals of Washington, Division 1.
July 10, 2000.
Reconsideration Denied August 2, 2000.
*784 Anne Kysar, Neil Martin Fox, Linda Lillevik, Seattle, for Appellant in No. 41532-B-1.
Kenneth Fred Bromet, Seattle, for Amicus Curiae (Parents) in Nos. 41532-8-1, 43014-9-1, 42778-4-1, 42952-3-1, 42923-0-1, and 42773-3-1.
Anne Kysar, Seattle, for Appellant in No. 43014-9-1.
Shannon Dale Anderson, King Co. Pros. Office, Seattle, for Respondent in #43014-9-1.
Gregory Charles Link, Seattle, for Appellant in No. 42778-4-1.
Catherine Ann Chaney, Seattle, for Appellant in Nos. 42952-3-1, 42923-0-1 and 42773-3-1. *781 *782
*783 ELLINGTON, J.
These six cases raise challenging issues of daily significance in juvenile courts across the state: What are the source and scope of a court's contempt powers in juvenile status offense cases, and what procedure is required in such proceedings?
It is axiomatic that a court must be able to enforce its orders. It is equally clear that the requirements of due process must be honored. The juvenile contempt statutes provide that commitment to detention for determinate periods of time is a "remedial" sanction. Read literally, this contravenes the Constitution. We hold, however, that the powers conferred by the statutes can be constitutionally exercised so long as courts ensure due process safeguards are in place. The statutes are therefore the first source of the court's contempt powers, and the juvenile court may not exercise inherent contempt powers unless the statutory powers are clearly inadequate. We also hold that the rules of evidence apply, and witnesses must be sworn. Finally, we examine the actions taken in each case to discern whether the orders met these requirements, reaching varying results.

Overview
This opinion addresses six linked appeals. Each case involves a youth who was either a child in need of services (CHINS), an at-risk youth (ARY), or a truant.[1] Each of these youths was found in contempt for failing to abide by a court order, was ordered detained, and was provided with a means to purge the contempt. In four of the cases, the court required the youths to purge their contempts by writing papers of a specified length explaining how they planned to comply with the court order each had violated. In another case, the youth was required to enroll in, and be accepted by, an inpatient substance abuse program. One youth was not released until DSHS found a therapeutic foster care placement for her.
The facts of each case will be set forth with more specificity below. In general, however, these appeals raise the following issues. First, the 1998 amendments to the Becca Bill, which labeled as "remedial" all detention sanctions for violations of CHINS, ARY, and truancy orders, are challenged as violative of due process. Second, the purge conditions in each of the cases are challenged because the child contemnors were required to perform acts not required by the original court order. The youths argue that a purge condition can require nothing beyond compliance with the original order, and that the imposition of an additional burden renders a purge condition punitive. Finally, one youth contends that a juvenile court may not base its contempt finding on inadmissible hearsay or unsworn testimony.[2]

Discussion
A. Mootness
The issues presented are technically moot. Each of the juveniles has either *785 served or purged the detention time imposed. Nevertheless, we may decide a moot case if it involves a matter of continuing and substantial public interest.[3] In determining whether an issue involves a substantial public interest, we consider the public or private nature of the question presented, the need for an authoritative determination that will provide future guidance to public officers, and the likelihood the question will recur.[4]
These six cases meet these criteria. The public nature of the issues and their frequency of recurrence are evident. Our resolution will affect the nature and process by which courts impose contempt sanctions on children who violate CHINS, ARY, and truancy orders. In addition, the constitutional due process issues raised by the 1998 amendments to the Becca Bill indicate the need for clarification of the distinction between civil and criminal contempt. These are matters of substantial and continuing public interest, and we therefore review the merits.
B. Amicus Curiae
Each of the youths is represented by counsel on appeal. Their parents, who are the respondents in five of the six cases,[5] are not represented and filed no response. Because the use of contempt to enforce CHINS, ARY, and truancy orders raises issues of substantial public interest, we appointed amicus curiae to address the general interests of parents and thereby ensure an equitable review of the issues raised on appeal.
C. Becca Bill
In 1995, the Washington State Legislature enacted the Becca Bill to empower parents with the necessary means to raise their at-risk children.[6] The Becca Bill was named after Rebecca "Becca" Hedman, a troubled child who frequently ran away to a life on the streets of Spokane, where she was involved with drugs and prostitution. She was 13 years old when she was murdered by a 35-year-old prostitution client. At the time, Becca's parents believed she was safe in a residential drug counseling program, and were unaware she had run away from the clinic five times.[7] The legislature recognized Becca's plight as representative of that of other at-risk youth across the state, and acknowledged parents' cries for greater authority over their children:
Parents and courts feel they have insufficient legal recourse for the chronic runaway child who is endangering himself or herself through his or her behavior....
.... The legislature intends to give tools to parents, courts, and law enforcement to keep families together and reunite them whenever possible....
....
The legislature intends to increase the safety of children through the preservation of families and the provision of assessment, treatment, and placement services....[8]
The Becca Bill governs juveniles who are known as "status offenders." Status offenders are youths who are before the court because their behavior endangers their welfare.[9] They include runaways, at-risk youths, truants, and juveniles in need of mental health and substance abuse treatment.[10] *786 Each of the six youths here entered the juvenile court system either as a CHINS, an ARY, or a truant.
1. CHINS, ARY
RCW 13.32A.030(4) defines "child in need of services."[11] CHINS petitions may be filed by the child, a parent, or the State.[12] When a CHINS petition is granted, the court may order the child to reside in out-of-home placement.[13] RCW 13.32A.030(2) defines "at-risk youth."[14] ARY petitions may be filed only by a parent.[15] When an ARY petition is granted, the court generally orders the child to reside in the home.[16]
Once a child is adjudicated an ARY or CHINS, the court enters a dispositional order to "assist the parent in maintaining the care, custody, and control of the child" and assist the family with resolving family conflicts.[17] The statute authorizes the court to set conditions of supervision for the child and parent, including requirements that the child attend school regularly, obtain counseling, participate in substance abuse or mental health treatment, and report regularly to DSHS.[18] The court may also order "[a]ny other condition the court deems ... appropriate."[19] Conditions commonly imposed under this section include requirements to obey a curfew, avoid drugs or alcohol, refrain from smoking, submit to random urinalyses, and refrain from physical or verbal abuse. Parents can be required to enroll in counseling or "any other services for the child requiring parental participation."[20] Thus, parents are often ordered to refrain from physical or verbal abuse, or ensure that the child is enrolled in school.
Failure to comply with a dispositional order by either parent or child can lead to a finding of contempt,[21] and the court must so advise both parent(s) and child at all CHINS *787 and ARY proceedings.[22] If the child is found to be in contempt, the court may impose a fine of up to $100 and/or confine the child for up to seven days.[23] A child may be confined only in a secure juvenile detention facility.[24]
2. Truancy
The Becca Bill also required steps to reduce or eliminate school absences. School districts are required to file a truancy petition when: (1) the child has five or more unexcused absences[25] within any month during the current school year or ten or more unexcused absences in the current school year; (2) actions taken by the school district have been unsuccessful in substantially reducing the child's absences from school; and (3) court intervention and supervision are necessary to assist the school district or parent to reduce the child's absences from school.[26] If the court grants the petition, it will assume jurisdiction over the child for the period of time most likely to result in the child returning to and remaining in school.[27] If the child fails to abide by the court's order to attend school, the court can find the child in contempt and impose detention or community service.[28]
D. Status Offenders in Detention
Following passage of the Becca Bill, Washington saw a marked increase in the number of petitions filed and the frequency of contempt violations and sanctions. During the second year following the bill's enactment, the number of ARY petitions increased nearly 500 percent, from 393 in 1994 to 1,936 in 1997. The number of truancy petitions increased from 91 to 15,627.[29] At the same time, courts increasingly imposed detention for failure to comply with ARY, CHINS, and truancy orders. From 1993 to 1997, the number of detention orders in these cases increased by more than 900 percent, from 222 to 2,044. The number of youths detained during these same years increased by nearly 700 percent. Detention days imposed rose from approximately 1,000 per year before the bill to more than 12,300 in 1997.[30] Approximately 60 percent and 27 percent of the detentions in 1997 occurred for violating ARY and truancy orders respectively.[31]
E. Distinguishing Punitive from Remedial Contempt
Washington's general contempt statute provides for either "punitive" or "remedial" sanctions.[32] A punitive sanction is imposed to punish a past contempt of court for the purpose of upholding the authority of the court.[33] A remedial sanction is imposed for the purpose of coercing performance when the contempt consists of failure to perform an act that is yet in the person's power *788 to perform.[34] Remedial sanctions are civil rather than criminal and do not require criminal due process protections.[35]
Because most contempt sanctions contain both remedial and punitive elements, however, distinguishing criminal from civil contempt is a notoriously difficult task.[36] In determining whether a particular sanction is civil or criminal, courts look not to "`the subjective intent of a State's laws and its courts,'" but examine the "`character of the relief itself.'"[37] In addition, the contempt power must be used with great restraint. As the U.S. Supreme Court has noted, "the contempt power also uniquely is liable to abuse."[38] Thus, a contemnor should be incarcerated only when no alternatives appear available for coercing obedience to the court's order.[39]
A contempt sanction involving imprisonment remains coercive, and therefore civil, if the contemnor is able to purge the contempt and obtain his release by committing an affirmative act.[40] In other words, the contemnor "carries the keys of his prison in his own pocket" and can let himself out simply by obeying the court order.[41] As long as there is an opportunity to purge, the fact that the sentence is determinate does not render the contempt punitive.[42] On the other hand, a prison term of a determinate length which does not provide the contemnor an opportunity to purge is generally considered punitive, and thus criminal.[43] Courts may not impose criminal contempt sanctions unless the contemnor has been afforded the same due process rights afforded other criminal defendants.[44] This includes initiation of a criminal action by filing of charges by the prosecutor, assistance of counsel, privilege against self-incrimination, and proof beyond a reasonable doubt.[45]
A coercive sanction is justified only on the theory that it will induce a specific act that the court has the right to coerce. Therefore, should it become clear that the civil sanction will not produce the desired result, the justification for the civil sanction disappears. Further incarceration can be justified as a punishment for disobeying the court's orders, but only after a criminal proceeding.[46]
*789 F. Constitutionality of Juvenile Contempt Statutes
As set forth above, contempt for violations of CHINS or ARY dispositional orders is governed by RCW 13.32A.250, and contempt for truancy order violations is governed by RCW 28A.225.090.[47] Our general contempt statutes, RCW 7.21, also apply. The legislature amended these statutes in 1998.
1. Contempt Law Prior to 1998
Former RCW 13.32A.250 provided:
(2) Failure by a party to comply with an order entered under this chapter is a contempt of court as provided in chapter 7.21 RCW subject to the limitations of subsection (3) of this section.
(3) The court may impose a fine of up to one hundred dollars and confinement for up to seven days, or both for contempt of court under this section.
Former RCW 28A.225.090 provided:
(2) If the child fails to comply with the court order, the court may order the child to be punished by detention or may impose alternatives to detention such as community service. Failure by a child to comply with an order issued under this subsection shall not be punishable by detention for a period greater than that permitted pursuant to a civil contempt proceeding against a child under chapter 13.32A RCW.
In two cases directly addressing the relationship of these two juvenile contempt provisions to the general contempt statute, this court held that former RCW 13.32A.250 incorporated RCW 7.21 such that a court "must follow the dictates of the latter statute when considering allegedly contemptuous behavior by an `at risk youth.'"[48]
Both cases highlighted the distinction between criminal and civil contempt as applied to violations of ARY orders. In K.L., the juvenile court determined that K.L. was an ARY, entered a dispositional order requiring K.L. to abide by various conditions of supervision, and advised K.L. verbally and in writing that violations could result in contempt sanctions. K.L. failed to abide by the order, and the juvenile court imposed seven days of detention with no opportunity to purge. This court reversed, finding the imposition of detention without the opportunity to purge to be punitive. The court explained: "RCW 13.32A.250, as it is now codified, requires the filing of an information by the prosecutor in order for the juvenile court to impose a determinate punitive sanction for the violation of an ARY order."[49] In a footnote, the court stated, "the Legislature remains free to amend the statute to require otherwise."[50]
In A.D.F., the child violated the court's ARY order to attend school regularly and return home afterwards. The juvenile court imposed 14 days of detentionseven days for each violationwith no opportunity to purge the contempt. We reversed, because such a sanction is punitive and was imposed without the necessary criminal due process.[51]
2. 1998 Amendments
The legislature responded swiftly to K.L. and A.D.F.[52] by amending the Becca Bill in *790 1998 to add a subsection [ (e) ] to the general contempt statute directed at CHINS, ARY, truancy, and dependency contempt proceedings. RCW 7.21.030(2)(e) provides:
(2) If the court finds that the person has failed or refused to perform an act that is yet within the person's power to perform, the court may find the person in contempt of court and impose ... the following sanctions:
....
(e) In cases under chapters 13.32A [CHINS, ARY], 13.34 [dependency], and 28A.225 [truancy] RCW, commitment to juvenile detention for a period of time not to exceed seven days. This sanction may be imposed in addition to, or as an alternative to, any other remedial sanction authorized by this chapter. This remedy is specifically determined to be a remedial sanction.[53]
The legislature concomitantly amended the CHINS, ARY, truancy, and dependency contempt language to accord with the new section quoted above.[54] RCW 13.32A.250, which governs CHINS and ARY cases, was amended as follows:
(2) Failure by a party to comply with an order entered under this chapter is a civil contempt of court as provided in (chapter 7.21) RCW7.21.030(2)(e) subject to the limitations of subsection (3) of this section.
(3) The court may impose remedial sanctions including a fine of up to one hundred dollars and confinement for up to seven days, or both[,] for contempt of court under this section.[55]
RCW 28A.225.090, which governs truancy, was amended as follows:
(2) If the child fails to comply with the court order, the court may order the child to be punished by detention, as provided in RCW 7.21.030(2)(e), or may impose alternatives to detention such as community service. Failure by a child to comply with an order issued under this subsection shall not be punishable by detention for a period greater than that permitted pursuant to a civil contempt proceeding against a child under chapter 13.32A RCW.[56]
The legislature made the following findings:
The legislature finds that an essential component of the children in need of services, dependency, and truancy laws is the use of juvenile detention. As chapter 7.21 RCW is currently written, courts may not order detention time without a criminal charge being filed. It is the intent of the legislature to avoid the bringing of criminal charges against youth who need the guidance of the court rather than its punishment. The legislature further finds that ordering a child placed in detention is a remedial action, not a punitive one. Since the legislature finds that the state is required to provide instruction to children in detention, use of the courts' contempt powers is an effective means for furthering the education and protection of these children. Thus, it is the intent of the legislature to authorize a limited sanction of time in juvenile detention independent of chapter 7.21 RCW for failure to comply with court orders in truancy, child in need of services, at-risk youth, and dependency cases for the sole purpose of providing the courts with the tools necessary to enforce orders in these limited types of cases because other statutory contempt remedies are inadequate.[57]
The amendments and the legislative findings indicate the legislature intended detention, *791 standing alone, to be a remedial sanction for status offense contempts.
The new law went into effect on June 11, 1998. Since then, only two reported cases have discussed contempt in the context of ARY, CHINS, or truancy proceedings. In In re Truancy of Perkins,[58] a juvenile court found two girls in contempt for violating a truancy order requiring them to attend school. The girls eventually served two and 14 days in detention respectively. They argued on appeal that courts were prohibited from imposing punitive, determinate sentences because the truancy statute authorized only civil contempt. The Perkins court disagreed. Looking to the plain language of the truancy statute, RCW 28A.225.90(2), which provided that failure to obey the court's order may be "punished by detention," the court stated: "Where detention is imposed ..., the sanction is punitive, and does not violate the statute."[59]
The parties in Perkins did not raise, and the opinion did not address, the due process requirements for punitive contempt. The court declined to consider the effect of the legislature's 1998 amendments to the contempt statute, focusing instead on the law as it existed prior to 1998 and applied to appellants.[60]Perkins thus provides no guidance to our analysis.
In In re Interest of Rebecca K.,[61] three juveniles were held in contempt for violating ARY orders. Each of the youths was ordered to serve determinate periods of detention, but none was provided an opportunity to purge. The Rebecca K. court reversed the contempt orders and sanctions, holding that the imposition of detention without a purge clause was punitive and imposed without the requisite due process.[62] In framing its opinion, the court considered the 1998 amendments, and concluded that the legislature's decision to label all contempt sanctions as "remedial" did not change the nature of a particular sanction.[63] We agree, and turn now to a discussion of these amendments.
3. Effect of 1998 Amendments: Constitutional Issues
The opinion in K.L. invited the legislature to amend the contempt statute as it applied to status offenders, and the legislature swiftly responded, labeling as "remedial" all sanctions, including detention, for violations of ARY, CHINS, and truancy orders.
The legislature acted in the belief that chapter 7.21 RCW, as it had been formerly written, prohibited courts from ordering detention without a criminal charge being filed.[64] The legislature found that imposing detention was "remedial" because children receive instruction in detention, and therefore detention is an effective means for educating and protecting children.[65]
It is true that children in detention are safe, at least relatively so, and they may be educated by attending detention school. But detention is still incarceration and still a place of punishment. The character of a sanction does not change simply because the legislature changes its label. As the U.S. Supreme Court has observed, "the labels affixed either to the proceeding or to the relief imposed under state law are not controlling and will not be allowed to defeat the applicable protections of federal constitutional *792 law."[66] Rather, the nature of the sanction as criminal or civil derives "from ... the character of the relief itself."[67] The use of a detention sanction without a purge condition renders the contempt punitive. "An unconditional penalty is criminal in nature because it is `solely and exclusively punitive in character.'"[68] Washington follows the same analysis.[69]
The legislature's denomination of detention as a remedial sanction is not, by itself, enough to make it so, and to the extent the legislature intended that detention, standing alone, be a remedial sanction, its intent cannot be given effect. Nonetheless, the legislature's chief objective was to make detention available as a coercive tool for juvenile courts. This the legislature can clearly do. Effect can be given to the legislature's intent without violating the constitutional parameters of remedial contempt authority. So long as the required purge condition is supplied by the court, both legislative intent and the requirements of due process are satisfied.[70]
This is not a strange or even a strained approach. Courts will construe a statute so as to render it constitutional.[71] Indeed, we note that under the general contempt statute, no mention is made of purge conditions, yet courts routinely impose purge conditions to render the use of the incarceration sanction properly coercive.[72]
The statute limits the available detention sanction to a maximum of seven days.[73] This limit is consistent with the legislature's remedial purpose. While the limit invites imposition of a determinate number of days, the contempt is not thereby rendered punitive. The determinacy of an incarceration sanction is not the test for whether contempt is punitive or coercive. A determinate sanction with a purge condition is really an indeterminate sanction with a maximum length, because the contemnor has the means to obtain release at any time.[74] The seven-day maximum is an expression of the legislature's intent that a remedial contempt sanction may include a "limited sanction of time in juvenile detention."[75]
G. Permissible Purge Conditions
As discussed above, an examination of the character of the relief informs the determination of whether contempt is classified as remedial or punitive. A sanction is remedial if imposed to coerce an act "yet in the person's power to perform."[76] In State v. Buckley, the court held that if a contempt sanction "does not afford the defendant an opportunity to purge the contempt by performing the acts required in the original order," it is punitive.[77] The appellants seize upon Buckley `s reference to "the acts required in the original order," and contend that courts may not require a contemnor to purge contempt *793 by performing an act that was not required by the original court order.[78]
In most contempt cases, compliance with the original order will indeed purge the contempt. Thus, in the context of child support, a delinquent parent can be detained for a determinate period or until he or she pays.[79] An individual held in contempt for not producing documents may be committed to prison until he complies with the original order by producing the documents.[80] But the child contemnor in a status offense case cannot retroactively comply with a requirement to go to school daily or follow a curfew. Unlike the contemnor who fails to pay support, the child contemnor has no accruing balance that can be brought current to purge the contempt. And unlike the contemnor who has failed to produce documents, the child cannot perform his or her obligations by going to school yesterday. Nor can a child held in detention comply with most of the common conditions of a dispositional order.
Does the child contemnor's inability to comply with the court's original order while in detention render a detention sanction punitive? The appellants contend that it does, and assert that the court's efforts to fashion remediessuch as writing papersand call them "purging conditions" only mask their punitive qualities. Appellants take the position that the most a court can require is that the child promise to comply in the future.
We believe the court's powers are not as limited as appellants suppose. A contemnor's promise of compliance is the first step. But where that promise is demonstrably unreliable, the court can insist on more than mere words of promise as a means of purging contempt. To conclude otherwise would render the statutes unenforceable and reduce the court to the level of beggar.
The challenge lies in determining how courts can exercise their discretion to fashion an appropriate purge condition such that the court is assured of the contemnor's future compliance while also ensuring that the sanction is remedial.
Although we have located no discussion of this precise question,[81] a decision of the Wisconsin Supreme Court is instructive. In In re Marriage of Larsen,[82] that court addressed the court's inherent authority to impose purge conditions beyond the four corners of the violated order. Larsen, a Vietnam War veteran, repeatedly failed to make child support payments. The court's attempts to enforce its support order met with minimal success, and eventually Larsen was ordered to serve 90 days in jail. The trial court determined that Larsen's contempt related to his inability to find a job, which in turn was directly related to his Post Traumatic Stress Disorder (PTSD). The court granted him an opportunity to stay the sentence and purge his contempt by voluntarily seeking treatment for the PTSD.[83]
On appeal, Larsen contended he was entitled to criminal due process protections because the purge condition was tantamount to an involuntary commitment.[84] The Wisconsin *794 Supreme Court disagreed, and set forth the following rule: "If a circuit court grants a purge condition, the purge condition should serve remedial aims, the contemnor should be able to fulfill the proposed purge, and the condition should be reasonably related to the cause or nature of the contempt."[85]
We find the Larsen court's rule a workable approach to ensuring that due process requirements are met, particularly in the context of juvenile contempt proceedings. Child contemnors should first be given the opportunity to promise future compliance. To this end, we agree with the appellants' contention that ordinarily, a child contemnor's promise to comply with the court's original order will purge an initial contempt. However, where such a promise is demonstrably unreliable (as it may be even on a first contempt), the court is entitled to reject the bare promise as insufficient because unpersuasive, and impose a purge condition aimed at reassuring the court that compliance with the original order will indeed be forthcoming. This condition must meet three requirements. First, it must be designed to serve remedial aims; that is, it must be directed at obtaining future compliance. Second, the condition must be within the power of the child to fulfill. Third, the condition must be reasonably related to the cause or nature of the child's contempt.
The Larsen test is consistent with the only discussion we have found in Washington contempt law on the subject of what a contemnor may be required to do to persuade the court of his or her willingness to comply in the future. In In re Marriage of Farr,[86] the trial court found a father in contempt for violating the terms of a parenting plan. The court ordered the father to serve jail time without providing a purge condition. Part of the jail sentence was stayed pending appeal. In remanding for the trial court to provide an opportunity for the father to purge the contempt, the court stated:
Martin must be given the opportunity to establish that he is willing to comply with the court orders and thus avoid any jail time. For example, the court could incarcerate Martin for 15 days or until he submits a satisfactory written plan detailing how he is going to comply with the court orders. This would provide a method for Martin to purge the contempt. We do not mean to foreclose other possible methods of satisfying RCW 26.09.160.[87]
Farr is similar to juvenile status offense cases, in that the contemnor could do nothing to "bring current" his delinquent performance of the original order. The violations of the parenting plan in Farr involved conduct which could not be recaptured or corrected retroactively, and future compliance was the only issue in crafting a purge condition. Yet the court did not suggest that the only avenue available to the trial court was to accept the contemnor's promise to comply in the future, but instead suggested a remedy very like the writing of papers by juvenile status offenders. Like the court in Farr, we see nothing inappropriate in a purge condition requiring a written explanation to the court as to how the contemnor intends to comply in the future with the portion(s) of the original order that he or she violated in the past. And as in Farr, we do not mean to foreclose other possible purge conditions that will satisfy the court of the child's future compliance.
In short, we hold that when a CHINS, ARY, or truant youth is in contempt, and the record shows that the child contemnor's mere promise to comply with the original court order is demonstrably unreliable, the court may impose the statutory detention sanction so long as the court establishes a meaningful purge condition that serves remedial aims, can be fulfilled by the child, and is *795 reasonably related to the cause or nature of the contempt. Upon performance of the condition, the child must be released.
H. Inherent Contempt
Amicus argues that juvenile courts can rely on their inherent contempt authority, rather than impose statutorily-based punitive or remedial contempt sanctions. Amicus fails to appreciate, however, that inherent contempt powers are appropriately exercised only when the powers conferred by statute are demonstrably inadequate.
Judges have inherent power "(1) to punish summarily contemptuous conduct occurring in the presence of the court; (2) to enforce orders or judgments in aid of the court's jurisdiction; and (3) to punish violations of orders or judgments."[88] The court's inherent powers may not be nullified by statute.[89] But neither may courts deviate from the statutory scheme unless the statutory powers are in some specific way inadequate.[90] Otherwise, a resort to inherent powers effectively nullifies the statutes.[91]
The risks of exercising inherent power to deviate from a comprehensive statutory scheme may be many. There is a significant danger, for example, that the discretionary use of inherent contempt power to deal with runaways will become a systematic response. Such a practice increases the risk of overcrowding as well as the risk that runaways will be housed with criminal offenders.[92] Concerns with the fiscal and administrative consequences of indefinite incarceration were likely a motivation for the legislature's decision to place a statutory limit of seven days on detention for contempt. If the court's fundamental concern is to protect the child from the risks of the street, the proper way to proceed is not in the guise of an inherent contempt order, but rather pursuant to the specific statute designed for that purpose, RCW 13.32A.197.[93]
The statutes set forth a procedure for contempt in juvenile cases, and we have held that with the addition of a simple due process safeguard in the form of a purge condition, the statutory scheme is workable and constitutional. Juvenile courts must work within those parameters: "Unless the legislatively prescribed procedures and remedies are specifically found inadequate, courts should adhere to them and are not free to create their own."[94] On the rare occasion when a juvenile court decides it must disregard the statutory seven-day limit and resort to its inherent contempt powers, the court must enter a finding as to why the statutory remedy is *796 inadequate and articulate a reasonable basis for believing why some other specific period of detention will achieve what seven days will not.
We emphasize, too, that although inherent contempt power may be used where the statutory powers are inadequate, the due process requirements remain the same.[95] In other words, due process prohibits a court from using either statutory or inherent power to justify its actions if the contempt sanctions are themselves punitive, unless the contemnor is afforded criminal due process protections, including the safeguards of a criminal trial.
I. Application to Appellants
Each of these six cases involves some variety of challenge to the purge conditions imposed by the court. We have described the requirements for such conditions, and we now apply those rules to the facts of appellants' cases. In each case, the court treated the contempt as remedial, and criminal due process safeguards were not employed. In this context, we also discuss R.T.'s contentions that the rules of evidence apply in juvenile contempt proceedings, and that both the rules of evidence and due process require that contempt findings be based on sworn testimony.
We review a contempt finding for abuse of discretion.[96] A court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.[97] A finding of contempt will be upheld as long as a proper basis can be found.[98] Except in R.T.'s case, it is not the findings of contempt that are challenged, but the purge conditions (R.T. challenges both). Fashioning a condition that meets the test set forth above, and deciding whether the condition is satisfied, are matters for the exercise of the court's discretion. Whether a purge condition exceeded the court's authority or violated a contemnor's due process rights, however, are questions of law, which are reviewed de novo.[99]
1. In re Interest of M.B.
a. Facts
Eleven-year-old M.B. did not return home six times, violated curfew repeatedly, used marijuana, associated with older people on the street, and lighted fires in the community. The court determined that M.B. was an ARY and imposed conditions of supervision. After she violated those conditions by ignoring her curfew and smoking, the court ordered her to serve four days of detention with two days suspended,[100] and provided that she could purge her contempt by writing a seven-page paper explaining how she planned to comply with the court orders. The commissioner explained this requirement to M.B. as follows:
Like, for instance, tell me how do you plan to stayfirst of all, do you plan to stay home as you've been directed? And how do you plan to do that? Do you intend to watch some programs on television like some ... child-related programs.... Do you intend to do your homework when you're at home? Do you intend to read some books?
The court told M.B. that if she finished the paper that day, she could return to court the next day and be released.
On M.B.'s motion for revision, the superior court essentially affirmed the commissioner. Because M.B. had already served one of the two days ordered, however, the court reduced *797 the page requirement to four and permitted access to the court the same day.
b. Discussion
Permitting M.B. to purge her contempt by writing about how she planned to comply in the future was an entirely appropriate exercise of the court's discretion. The court's objective was to coerce future compliance, and there was both an ability to comply and a reasonable relationship between the purge condition and the nature and cause of the contempt. We see no error here.
As a cautionary note, however, we observe that M.B. was facing her first contempt violation, and the record does not reflect why no reasonable or effective alternatives to detention were available. As discussed above, detention is a sanction of last resort.[101]
We further observe that phrasing the sanction order as four days of detention with two days "suspended" is unnecessary and confusing. The concept of a suspended sentence does not belong in a coercive order. There is no reason to "suspend" any portion of a coercive sanction, even one that orders up to seven full days of detention. As noted above, a determinate sanction with a purge condition is really an indeterminate sanction with a maximum length.[102] Once the contemnor purges, the sanction is lifted, including all the remaining days potentially available if the contemnor had remained resistant.
2. In re Interest of J.B.
a. Facts
Kent School District records showed that J.B. had missed 20 days of school, and the District filed a truancy petition. J.B. admitted that she missed school because she "can't wake up all the time." The court declared J.B. to be truant and ordered her to attend school regularly. She did not. By the time of the contempt hearing on June 17, the regular school year had ended, and J.B. could not attend summer school due to financial constraints. J.B. again stated, and her mother confirmed, that J.B. slept through her alarm. Counsel for J.B. requested sanctions other than detention because this was J.B.'s first contempt.
The court found J.B. in contempt for failing to attend school, ordered her to serve no more than seven days in detention, and permitted her to purge the contempt by writing a paper on how she planned to get up for school. J.B. wrote the paper and was released.
b. Discussion
There was a reasonable relationship between J.B.'s contempt and the purging condition, and the court appropriately considered J.B.'s abilities in setting the purge requirements. But we identify two problems. First, as in M.B.'s case, the record does not reflect why detention was considered the appropriate sanction in a first contempt; the truancy statute specifically authorizes other remedial sanctions such as community service.[103] Second, to be coercive, the detention sanction must be imposed for remedial purposesthat is, to coerce future compliance. Such future compliance must be contemplated in reasonably immediate terms, which in the case of a child is a somewhat limited time frame. Here, the earliest J.B. could comply with the order was three months later, when school started again in the fall. Given the nature and cause of her contempt, imposing detention in June is unlikely to coerce compliance in September. The sanction was therefore not properly remedial and violated due process.
3. In re Interest of R.H.
a. Facts
Fourteen-year-old R.H. was found to be an ARY because she had run away from home for up to three weeks, refused to follow family rules and curfews, had chronic school disciplinary problems, and had admitted to drug and alcohol problems. The dispositional *798 order required R.H. to attend school regularly, follow drug and alcohol treatment recommendations, submit to random urinalyses, neither use nor possess drugs or alcohol, obey a curfew, reside with her parents, and refrain from verbal and physical abuse.
At a review hearing, the court found R.H. in contempt for failing to submit to urinalyses, follow outpatient treatment requirements, and obey her curfew. The court imposed four days of detention, all of which were suspended provided she purge her contempt by complying with the court order. At a purge review hearing six weeks later, the court found that R.H. had not purged the contempt because she had violated her curfew and had had positive urinalysis results. The court imposed the four days in detention that had previously been suspended, and stated that R.H. could be released from detention if she purged the contempt by writing a 25-page paper regarding "drug use and noncompliance of [the] court order." In another order entered the same day, the court found that R.H. had not abided by the curfew or urinalysis requirements since the last contempt hearing, and imposed seven days in detention, all of which were suspended provided she purge her contempt by complying with the court order.[104] R.H. wrote the paper and was released.
Two weeks later, R.H.'s father filed a motion for contempt because R.H. had failed to comply with the court's order by violating her curfew, failing to attend school, and refusing to submit to urinalyses. R.H. admitted the truth of her father's allegations. The court noted that R.H. had purged the four days, but that the seven suspended days remained outstanding. Counsel for R.H. asked the court to re-suspend detention so R.H. could voluntarily reenter a treatment program. The court found R.H. in contempt and imposed 14 days in detention, suspended on the condition that she purge her contempt by complying with the court's order and voluntarily enrolling in an inpatient substance abuse treatment program.[105]
R.H.'s counsel objected that the treatment requirement was an improper purge condition. The commissioner responded:
[Y]our only basis for keeping her out of 14 days detention at this moment is your representation to the Court that she needs inpatient treatment and that she's willing to do it.
....
So, that's how she can purge, by following through on what you've represented to the Court. Now, I'm not ordering her to go in inpatient treatment because I don't have the authority to do that, but I'm finding her in contempt and giving her the opportunity to purge by doing what she has represented through you that she intends to do.
Seven weeks later, the court found R.H. had not purged her contempt, and imposed the previously suspended detention days, subject to R.H.'s release if she purged her contempt by "enrolling and being accepted [in]to a treatment program." The revision court upheld the purge condition of voluntary treatment.
b. Discussion
R.H. first argues that a purge condition requiring a paper of 25 pages is punitive. Her argument is simply that 25 pages is too much to require of a child. We disagree with the proposition that some arbitrary length is automatically beyond the permissible scope *799 of a remedial sanction. The record does not reflect what factors the court considered in setting the length requirement, but the subject matter of the paper was reasonably related to the nature and cause of the contempt, and R.H. had failed to purge her first contempt.
Several problems nevertheless remain. The court acknowledged that the purge condition on the third contempt exceeded the court's authority. Under RCW 13.32A.196(2)(c), an ARY dispositional order may require participation in substance abuse or mental health outpatient treatment programs, but under RCW 13.32A.196(3), courts are prohibited from requiring "involuntary commitment of a child for substance abuse or mental health treatment." Nonetheless, R.H. had indicated her willingness to enter treatment, and the court relied on that willingness in setting enrollment in the treatment program as a purge condition. This is not necessarily inappropriate. If the child intends to enroll, the court can certainly recognize such enrollment as constituting a purge of the contempt.[106] The court cannot, however, require it. In other words, while the court has discretion to recognize a child's voluntary efforts to do something the court cannot require by giving notice that such efforts will be deemed to purge a contempt, the court must also provide a purge condition that is within the court's authority; otherwise the voluntary condition has become mandatory. Here, R.H. had no other avenue for release from detention, so the impermissible condition was mandatory. This exceeded the court's authority.
Another difficulty lies in the fact the condition required R.H. both to enroll in and be accepted by a treatment program. The contemnor must carry the keys of the prison door in her own pocket. R.H.'s acceptance into a program was not within her sole control. If R.H.'s ability to purge herself of the contempt is dependent upon the actions of a third party, the purpose of civil contempt is defeated.
For these reasons, the treatment purge condition was punitive and therefore unlawful.
4. In re Interest of C.W.
a. Facts
Fifteen-year-old C.W. was found to be a CHINS and placed in the care of DCFS. At a May 5, 1998 disposition hearing, the court released C.W. to his mother and entered conditions of supervision, ordering him to attend school regularly, submit to random urinalyses, neither use nor possess drugs or alcohol, refrain from smoking, obey curfew, enroll in and attend counseling, reside with his mother, and refrain from verbal and physical abuse and property damage. On June 9, C.W. was found in contempt because he did not go to school, ran from home, and refused to take a urinalysis.
The court found C.W. in contempt, rejected his request for community service instead of detention, and ordered him to seven days in detention, with four days suspended on the condition that C.W. follow the court's original order until the next hearing. The court informed C.W. that he could purge the contempt by writing a 15-page paper explaining why he refused to follow the court order, and how he would comply in the future.
C.W. was incarcerated in the juvenile detention facility that afternoon. His attorney visited him the next morning (June 10) at approximately 11:00 a.m., at which time he had not yet received paper or pencil. At counsel's request, C.W. was supplied with pencil and paper, and he wrote a 10-page paper. At a purge hearing that afternoon, the court denied release because C.W. had written only 10 double-spaced pages:
The purpose of the length of the paper is to have him give a complete thought to everything that he's done. He's not addressed at all, for example, the fact that his conduct in violating the Court Order resulted in the manager of the apartment building of which the mother resides telling him that he couldn't go back to the property at all. This is a case in which the mother has lost her residence in the past because of the conduct of this child. *800 Counsel objected to the court's ruling because the conduct to which it referred was not the basis for the contempt finding, and argued that the paper written by C.W. reflected his willingness to comply with the court's order. The court rejected C.W.'s argument. C.W. was released the following day after he wrote another paper.
b. Discussion
There are two problems presented. First, the subject of the writing assignment (why C.W. failed to comply, and how he planned to comply with the court's order), while somewhat vague, was reasonably related to the contempt. But C.W. had no means by which to fulfill the condition in the absence of paper and pencil. While it is not the business of this court to micromanage the state's juvenile detention facilities, and we do not attempt to set a finite number of minutes or hours within which the juvenile contemnor must be provided with paper and pencil if those are the means by which he or she can purge a contempt, we hold that C.W. was forced to wait too long. A detained contemnor should have opportunity to fulfill a purge condition by the next available hearing day, so as to present a request for release to the court at the earliest time. Had C.W.'s attorney not called for supplies to be provided, it is unlikely C.W. would have been before the court that afternoon. Only because of counsel's intervention did the condition remain remedial.
Second, in rejecting C.W.'s first paper as inadequate, the court imposed content requirements not originally described. The purge condition is not subject to ongoing modification and increasing onerousness. The court has discretion to determine whether the contemnor has satisfied the purge condition, but the court must state its expectations with sufficient clarity to communicate what is required. Here, the court's imposition of additional requirements not originally included as part of the condition was punitive in effect and purpose, and therefore unlawful.
C.W. also argues that such additional content could not have been required even had the court clearly enunciated its expectations initially, because the new content requirement referenced conduct that was not the basis for the contempt and therefore was not reasonably related to the nature and cause of the contempt. We reject C.W.'s argument that a court can never require a contemnor to write a paper demonstrating an understanding of the costs of his conduct to those affected by it. Such a requirement might in some cases be far more persuasive regarding future compliance than a mere description of how a contemnor plans to comply in the future, and we cannot say such a condition would never be reasonably related to the nature and cause of the contempt. We can only say that the court's second set of criteria here was an improperly onerous modification.
5. In re Interest of D.M.
a. Facts
Twelve-year-old D.M. filed a CHINS petition on March 4, 1998. On March 13, the court granted the CHINS petition, ordered D.M. to remain in placement with her mother, and ordered both D.M. and her mother to refrain from physical and verbal abuse and to continue family counseling.
At some point thereafter, D.M. went to live with her father.[107] On June 12, the court found D.M. in contempt for running from her father's home. D.M. had been found in contempt prior to June 12, and had not purged the contempt.
The court determined that statutory remedies were inadequate and ordered D.M. to detention for seven days. The record is unclear as to whether the court ordered D.M. to serve any part of the detention time or whether she was provided an opportunity to purge.
D.M. then went to live with her mother. On June 19, the court found D.M. in contempt for running from her mother's home, and ordered her to "detention for an undeterminated *801 amount of time, suspended," and permitted her to purge the contempt by complying with the court order.
On June 25, D.M.'s mother filed a contempt motion, alleging that D.M. ran from her home, and the court issued a warrant for her arrest. D.M. was arrested on the warrant. At D.M.'s detention review hearing the next day, the review judge scheduled a contempt hearing for June 30 before the commissioner who had entered the prior orders, and who had retained jurisdiction in D.M.'s case. An order was also entered requiring D.M. to remain in detention until the contempt hearing because she would otherwise likely fail to appear.
At the June 30 hearing, the court found D.M. in contempt. D.M.'s mother testified that D.M. was not welcome in her home. A DSHS caseworker informed the court that short-term placement was available immediately, but that locating a long-term foster home could take time, and a group home placement was unavailable because of a lengthy waiting list. The court ordered that D.M. remain in detention until DSHS located an appropriate long-term foster home for her. The court again stated that the civil contempt remedies set forth RCW 13.32A were inadequate in D.M.'s case. In its oral ruling, the court added:
In the interval, [D.M.] can ask for a purge hearing, to be held only in front of me, if she feels that she can convince me that she is going to comply with court orders without any additional sanction or modification of court orders. I would advise [D.M.], though, that, given her record of saying she is going to comply and running, that that is an uphill battle, to convince me.
D.M.'s counsel then asked how to seek a purge hearing. The commissioner responded:
THE COURT: [A]nything that you can do that would come to my attention would be helpful. You are limited, in a sense, logistically, in that I am only up here on Tuesdays; I am in Kent Wednesday and Friday, and I don't think they have transportation down to Kent right now; they only have it going one way. So, the earliest she can have a hearing in Seattle is next Tuesday.
MS. CHANEY: And I guess that's whythat reinforces my objection that this is not a proper form of civil contempt, because basically the Court is sentencing her to be here until next Tuesday, at least.
THE COURT: Well, if you have a letter from her, if you have anything that can convince me otherwise, I can try and and there is an available courtroom, I can try and come in on Thursday or tomorrow [Wednesday] and do it up here. You know, I realize that she is in a tough situation, since detention is up here and I am down there.
The written order provided that, as a means of purging her contempt, D.M. be given paper and pencil to write a letter to the court about how she would comply with the court's order.
The next day, July 1, D.M. wrote a letter which was faxed to the commissioner, along with a request for a purge hearing. The court denied D.M.'s request, finding the letter insufficient to purge the contempt:
The document simply reiterates information provided by [D.M.] in a previous document written by the youth in April for a purge hearing on a previous contempt finding. Since then[,] there have been at least 3 contempt motions filed by her parents and this Court has found that the statutory remedies are not sufficient in this case. [D.M.] continues to run and put herself in grave danger and the current document by her shows little insight or promise of good behavior and compliance with placement orders.
Following a purge hearing on July 7, the court released D.M. to DSHS for foster care placement. The court ordered that D.M. remain under an "ongoing" finding of contempt because the statutory remedies were insufficient to ensure her compliance, and that D.M. could purge the contempt by remaining in placement and complying with court orders.[108] *802 b. Discussion
D.M.'s case illustrates the tension between the court's legitimate, deep concern for a child's safety on the one hand, and the constitutional reach of the court's contempt powers on the other. In this regard, the case raises a number of issues.
D.M. challenges the court's decision to place her, by means of the court's inherent power, under an indefinite finding of contempt. The commissioner ordered her into detention until a foster home could be located for her. As it happened, the court was able to release her into the custody of DSHS within seven days, but the court kept her under an "ongoing" finding of contempt, which she could purge only by remaining in placement.
As previously discussed, rarely should a court resort to its inherent contempt powers.[109] The commissioner clearly determined that the statutory remedies were inadequate, but the record of the two final hearings does not reveal why. Nor does it demonstrate what alternatives, if any, he considered before imposing an indefinite contempt sanction. Even assuming the court could not think of any other alternatives, the order has other infirmities.
One problem is that D.M.'s release from detention was contingent upon DSHS's ability to find a long-term foster care placement for her. As with R.H., whose release from detention was contingent on her being accepted into a treatment program, D.M. had no control over her release unless the court also imposed a proper purge condition as an alternative. The commissioner directed that D.M. could purge the contempt by writing a letter about how she would comply with the court's order, but said that convincing him would be an uphill battlea statement indicating that the key to release for D.M. would be location of a placement rather than anything she herself did. Also, his schedule kept him away from the juvenile court in Seattle for many days at a time, making him unavailable to conduct purge review hearings on a reasonably prompt basis. When judicial officers retain jurisdiction, some means must still exist for contemnors to achieve release in a reasonably prompt manner.
Another deficiency is that the commissioner's "ongoing" finding of contempt does not specify how long D.M. must refrain from running away in order to purge the contempt. The contemnor must be able to purge the contempt (and the threat of a detention sanction) within some definite time frame. Instead, the order appears to contemplate the possibility of keeping D.M. in detention periodically throughout her adolescence, so long as the commissioner believes she is likely to run away from placement. But if there is no basis for believing that continued detention will produce the desired result, then the justification for detention as a civil remedy has disappeared. Sanctions may be imposed to punish the recalcitrant child for continuing to disobey the court's order, but only after the safeguards of a criminal trial.[110] Here, the commissioner indicated that D.M. probably would be unable to purge her contempt, either by writing a convincing letter or by staying in placement. If the court believes a contemnor will not be able to satisfy the purge condition, detention becomes punitive rather than coercive and violates due process.
Finally, D.M. argues that she should have received "credit for time served" between her arrest and her contempt hearing. As of the June 30 contempt hearing, D.M. had already been detained for six days. *803 D.M. acknowledges that her detention was proper under RCW 13.32A.065,[111] but argues that because the contempt statutes permit detention for a maximum of seven days, she should not have been detained for any more than one additional day. We disagree. D.M. was detained on an arrest warrant and the court found she was not likely to appear of her own volition. The court's finding was amply justified and D.M. does not dispute it. The contempt sanction of coercive detention had not yet been imposed. The concept of "credit" presupposes a criminal sanction to be served, rather than a period of coercive detention. The pre-hearing detention time does not "count" toward the seven-day maximum.
6. In re Detention of R.T.
a. Facts
The court found 14-year-old R.T. to be an ARY and ordered him to attend school regularly, obtain drug and alcohol evaluations, submit to random urinalyses, neither use nor possess drugs or alcohol, obey a curfew, enroll in individual counseling, reside with his parents, and refrain from physical and verbal abuse. R.T.'s parents filed a contempt motion, alleging that R.T. used drugs, did not regularly attend Alcoholics Anonymous meetings, violated his curfew, engaged in verbal abuse, and refused to inform his parents of his whereabouts. The court found R.T. in contempt, ordered him to detention for three days, and informed him that he could purge his contempt by writing a 25-page, single-spaced report on how "you're going to live if you're not living with your parents; where you're going to get to go to school; whether you're going to see your friends from Northshore [Junior High] ever again," as well as his "future prospects of [his] ever quitting using drugs or getting [his] life under control" if he was not willing to enroll in an inpatient treatment program.
R.T. was incarcerated the afternoon of May 6, and did not receive a pencil or paper to write the required report until after 11:00 a.m. the following day. The court released R.T. on May 8, after he purged the contempt by submitting a paper about which the court stated, "It's not 25 pages long, but it is, I think, honest enough for me to allow you to purge with it."
b. Discussion
As with R.H., the subject of the paper is reasonably related to the nature and cause of R.T.'s contempt. As with C.W, however, R.T. did not have the immediate ability to fulfill the purge requirement because he did not receive paper and pencil until almost 24 hours after he was detained. The sanction therefore became punitive in character.
J. Rules of Evidence, Administration of Oath
R.T. contends the rules of evidence should apply in juvenile contempt proceedings for at-risk youth under RCW 13.32A.250. We agree.
Juvenile Court Rule 1.4(c) provides: "The Rules of Evidence shall apply in juvenile court proceedings to the extent and with the exceptions stated in ER 1101." The exceptions enumerated by ER 1101(c) include: contempt proceedings in which the court may act summarily; preliminary determinations in juvenile court proceedings; juvenile court disposition hearings; hearings declining jurisdiction under RCW 13.40.110; and review hearings under RCW 13.32A.190 (review hearings for out-of-home placements in ARY cases).
Contempt hearings under RCW 13.32A.250 do not fall within any of these exceptions. Moreover, the explicit reference in ER 1101(c)(3) to contempt proceedings in which the court may act summarily (that is, cases involving direct contempt)[112] is a strong indicator that the exceptions do not *804 apply (and therefore the rules of evidence do apply) in all other contempt proceedings.[113] Finally, there is no reason to suppose it appropriate to subject a child to contempt findings and sanctions, which may include detention, on unreliable evidence or unfair procedures. We hold that the rules of evidence apply in contempt proceedings under RCW 13.32A.250.[114]
R.T. alleges that at the contempt hearing, the court erroneously considered hearsay and unsworn testimony. R.T. is correct. R.T.'s mother was permitted to inform the court that R.T.'s caseworker had reported that his "prognosis" was poor, and that she had been told he had tested positive for marijuana use "in very high quantities." This was hearsay, was properly objected to, and should not have been admitted.
We note, however, that while the court referred to the hearsay evidence in its oral ruling, the court's written order clearly indicates that its finding of contempt was based not on R.T.'s alleged drug use, but on his curfew violations and failure to keep his parents informed of his whereabouts. The written order controls over any inconsistency with the oral ruling.[115] Therefore, while admission of the hearsay was improper, it caused no prejudice to R.T.
As to unsworn testimony, however, there is both error and prejudice. None of the participants at R.T's contempt hearing testified under oath.[116] R.T. contends that in basing the contempt order on contested unsworn statements, the court violated both ER 603 and his right to due process of law[117] under the federal and state constitutions.[118]
Our conclusion that the rules of evidence apply requires that witnesses be sworn.[119] Due process also requires it.
Due process requires an opportunity for a hearing appropriate to the nature of the case.[120] The procedural safeguards provided in a hearing must be tailored to the specific function to be served.[121] This determination turns on the balancing of three distinct factors: the private interests affected by the proceeding; the risk of error created by the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and the countervailing governmental interest supporting use of the challenged procedure.[122]
*805 Here, the child's liberty interest is obviously substantial. The risk of error is also high, because the primary function of requiring testimony under oath or affirmation is to provide "additional security for credibility" by impressing upon witnesses their duty to tell the truth, and to furnish a basis for a perjury charge.[123] This function is compromised where the participants are not aware of their duty to speak truthfully. In Nirk v. City of Kent Civil Service Commission, the court held that due process requires witnesses to be sworn at informal civil service discharge hearings.[124] Although such hearings are informal, and evidentiary rules do not apply, the court concluded that the significant interests at stake in employment discharge hearings and the importance of the oath outweighed the minimal inconvenience of administering it.[125] The court also noted that the use of unsworn testimony impedes effective appellate review because such testimony cannot be presumed to be truthful.[126] The value of safeguards in the form of sworn testimony is therefore also high.
Finally, we discern no governmental interest in the use of unsworn testimony in juvenile contempt proceedings. Instead, sworn testimony serves the government's interest by ensuring that the integrity of the courts is not compromised and that courts do not appear to use their authority arbitrarily. Given the substantial benefits and minimal burden of administering the oath, we conclude that due process requires that contempt findings for CHINS, ARY, and truants be based on sworn testimony.
The oath requirement is important to the truth-finding process. Failure to require testimony under oath, therefore, "taints the integrity of the entire proceeding."[127] Because R.T.'s contempt finding was based on unsworn testimony, it is vacated.[128]
K. Conclusion
We hold that juvenile courts may impose detention as a remedial sanction for contempt under RCW 13.32A.250 and RCW 28A.225.090, so long as a proper purge condition provides the juvenile with the keys to his or her release. We also hold the rules of evidence apply in proceedings under RCW 13.32A.250, and that witnesses must testify under oath. We find no error in the sanctions imposed upon M.B., but find the contempt sanctions in the cases of J.B., R.H., C.W., D.M., and R.T. violated due process. R.T.'s contempt finding itself also violated due process, and is vacated. Because the cases are technically moot, the effect of our holdings in the individual cases is left to future proceedings involving these youths, if any.
COX, J., and BECKER, A.C.J., concur.
NOTES
[1] See generally RCW 13.32A (ARY, CHINS); RCW 28A.225 (truancy). The legislature amended the statutes governing ARY, CHINS, and truants in 2000. See Laws of 2000, ch. 162. Nothing in these amendments, however, affects the court's contempt powers challenged here.
[2] See discussion infra Section J.
[3] In re Detention of Swanson, 115 Wash.2d 21, 24-25, 804 P.2d 1 (1990).
[4] In re Detention of McLaughlin, 100 Wash.2d 832, 838, 676 P.2d 444 (1984).
[5] In the case of J.B., which involves a contempt order for truancy, the Kent School District is the respondent.
[6] Laws of 1995, ch. 312. Most of the Becca Bill's provisions amended the Family Reconciliation Act, RCW 13.32A. The Becca Bill also amended the truancy language under RCW 28A.225.
[7] Alison G. Ivey, Comment, Washington's Becca Bill: The Costs of Empowering Parents, 20 SEATTLE U.L.REV. 125, 125-26 (1996).
[8] RCW 13.32A.010. See generally Ivey, supra note 7; Mistee R. Pitman, The Becca Bill: A Step Toward Helping Washington Families, 34 Gonz. L.Rev. 385 (1998).
[9] See generally Jan C. Costello & Nancy L. Worthington, Incarcerating Status Offenders: Attempts to Circumvent the Juvenile Justice and Delinquency Prevention Act, 16 Harv. C.R.-C.L. L.Rev. 41, 42-46 (1981) (defining status offenses and describing how the category is applied in the United States).
[10] RCW 13.32A.010.
[11] A child in need of services is a juvenile:

(a) Who is beyond the control of his or her parents such that the child's behavior endangers the health, safety, or welfare of the child or other person;
(b) Who has been reported to law enforcement as absent without consent for at least twenty-four consecutive hours from the parent's home, a crisis residential center, an out-of-home placement, or a court-ordered placement on two or more separate occasions; and
(i) Has exhibited a serious substance abuse problem; or
(ii) Has exhibited behaviors that create a serious risk of harm to the health, safety, or welfare of the child or any other person; or
(c)(i) Who is in need of necessary services, including food, shelter, health care, clothing, educational, or services designed to maintain or reunite the family;
(ii) Who lacks access, or has declined, to utilize these services; and
(iii) Whose parents have evidenced continuing but unsuccessful efforts to maintain the family structure or are unable or unwilling to continue efforts to maintain the family structure.
RCW 13.32A.030(4).
[12] RCW 13.32A.140, .150.
[13] RCW 13.32A.179.
[14] An "at risk youth" is a juvenile:

(a) Who is absent from home for at least seventy-two consecutive hours without consent of his or her parent;
(b) Who is beyond the control of his or her parent such that the child's behavior endangers the health, safety, or welfare of the child or any other person; or
(c) Who has a substance abuse problem for which there are no pending criminal charges related to the substance abuse.
RCW 13.32A.030(2). "At-risk youths" were first designated by the legislature in 1990. Laws of 1990, ch. 276, § 3.
[15] RCW 13.32A.191.
[16] RCW 13.32A.192(2).
[17] RCW 13.32A.179(2), .196(1).
[18] RCW 13.32A. 196(2).
[19] RCW 13.32A.196(2)(e).
[20] RCW 13.32A. 196(4).
[21] In 1981, the legislature first permitted juvenile courts to impose detention for youths found in contempt. Laws of 1981, ch. 298, § 14. The Act was amended in 1990, by the Becca Bill in 1995, in 1998, and most recently in 2000. Among the small language changes made to the contempt provisions by the 1995 legislature was to replace the word "imprisonment" with "confinement." Laws of 1995, ch. 312, § 29. The constitutionality of the 1998 amendments is discussed infra in Section F.
[22] RCW 13.32A.250(1).
[23] RCW 13.32A.250(3).
[24] RCW 13.32A.250(4). This provision was amended in the 2000 legislative session to authorize confinement either in a secure juvenile detention facility or "a secure facility that is a separate, secure section of a juvenile detention facility. In no case may a child in contempt be confined in a secure facility that is free-standing outside a juvenile detention facility." Laws of 2000, ch. 162, § 4.
[25] "Unexcused absence" means that a child has failed to attend the majority of hours or periods in an average school day and has failed to meet the school district's policy for excused absences. RCW 28A.225.020(2).
[26] RCW 28A.225.030, .035.
[27] RCW 28A.225.035(7).
[28] RCW 28A.225.090(2). As with RCW 13.32A.250(4), see supra note 24, this provision was amended in 2000. Laws of 2000, ch. 162, § 6.
[29] Donna D. Schram, Study of Status Offenders in Detention (1999), at 3-4 [hereinafter Schram Study]. The Schram Study was released in March 1999 by the Governor's Juvenile Justice Advisory Committee.
[30] Schram Study at 6.
[31] Schram Study at 10.
[32] A third type of contempt order, "summary punishment," is available for direct contempt committed in the courtroom in the judge's presence. See RCW 7.21.050. Each of the cases on appeal involves indirect contempt, so summary punishment is inapplicable. A court's "inherent contempt" powers are discussed infra in Section H.
[33] RCW 7.21.010(2).
[34] RCW 7.21.010(3).
[35] See International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 826-27, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); King v. Department of Soc. & Health Servs., 110 Wash.2d 793, 799-800, 756 P.2d 1303 (1988).
[36] See Bagwell, 512 U.S. at 827, 114 S.Ct. 2552 ("Although the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear."); Dan B. Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 245 (1971) ("[T]he effort by reviewing courts to label the case as a criminal or as a civil one is often an exercise in futility."); Earl C. Dudley, Jr., Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempts, 79 VA. L.REV. 1025, 1033 (1993) ("[T]he distinction has become a major source of the confusion that is endemic to the contempt process.").
[37] Bagwell, 512 U.S. at 828, 114 S.Ct. 2552 (quoting Hicks v. Feiock, 485 U.S. 624, 636, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988)); King, 110 Wash.2d at 799, 756 P.2d 1303 (courts look to substance of proceeding and character of relief the proceeding will afford). In King, the court examined a previous version of the juvenile dependency statute and determined it applied only to punitive contempt; the statute did not at that time reference the general contempt statute, and the general contempt statute had not yet been amended to include dependency proceedings.
[38] Bagwell, 512 U.S. at 831, 114 S.Ct. 2552 (internal quotation omitted).
[39] King, 110 Wash.2d at 802, 756 P.2d 1303.
[40] Bagwell, 512 U.S. at 828, 114 S.Ct. 2552.
[41] Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (citation omitted); King, 110 Wash.2d at 800, 756 P.2d 1303.
[42] See Shillitani v. United States, 384 U.S. 364, 370 n. 6, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) (upholding as civil a determinate (two-year) sentence which included a purge clause).
[43] Hicks, 485 U.S. at 632, 108 S.Ct. 1423; King, 110 Wash.2d at 799, 756 P.2d 1303.
[44] King, 110 Wash.2d at 800, 756 P.2d 1303.
[45] Bagwell, 512 U.S. at 826-27, 114 S.Ct. 2552; State v. Buckley, 83 Wash.App. 707, 713, 924 P.2d 40 (1996).
[46] King, 110 Wash.2d at 802-04, 756 P.2d 1303.
[47] There is also a contempt provision for dependency proceedings, RCW 13.34.165. For a discussion of juvenile contempt procedures in other jurisdictions, see Maggie L. Hughey, Holding a Child in Contempt, 46 Duke L.J. 353 (1996).
[48] In re Interest of A.D.F., 88 Wash.App. 21, 25, 943 P.2d 689 (1997); see also In re Welfare of K.L., 87 Wash.App. 574, 577, 942 P.2d 1052 (1997); Buckley, 83 Wash.App. at 713, 924 P.2d 40 (legislature intended RCW 13.32A.250 to include prosecutorial authority to bring action for criminal contempt, notwithstanding that it omitted listing prosecutor as person who can bring contempt motion). The truancy statute implicitly incorporated RCW 7.21 by referencing RCW 13.32A.
[49] K.L., 87 Wash.App. at 578, 942 P.2d 1052.
[50] K.L., 87 Wash.App. at 578 n. 2, 942 P.2d 1052. Since no legislative amendment could accomplish a determinate punitive sanction without according due process, see Bagwell, 512 U.S. at 826, 114 S.Ct. 2552, we interpret the footnote in K.L. to invite an amendment to RCW 13.32A.250 to provide for a remedial rather than punitive sanction.
[51] A.D.F., 88 Wash.App. at 26, 943 P.2d 689.
[52] The Final Bill Report to Substitute Senate Bill 6208 noted: "Two recent appellate court decisions have limited the use of contempt in CHINS and ARY proceedings." Final Bill Report, S.S.B. 6208, at 1 (Wash. 1998).
[53] Laws of 1998, ch. 296, § 36 (emphasis added).
[54] Laws of 1998, ch. 296, §§ 37-39.
[55] Laws of 1998, ch. 296, § 37.
[56] Laws of 1998, ch. 296, § 39. Ironically, the legislature did not delete the phrase "punished by detention."
[57] RCW 7.21.030, "FindingsIntent1998 c 296 §§ 36-39" (emphasis added).
[58] 93 Wash.App. 590, 969 P.2d 1101, review denied, 138 Wash.2d 1003, 984 P.2d 1033 (1999).
[59] Perkins, 93 Wash.App. at 599, 969 P.2d 1101.
[60] The court mistakenly quotes from the amended version of RCW 28A.225.090(2). Perkins, 93 Wash.App. at 596, 969 P.2d 1101. The error did not affect the outcome of the case.
[61] 101 Wash.App. 309, 2 P.3d 501 (2000).
[62] Rebecca K., slip op. at 10 (quoting In re Interest of A.D.F., 88 Wash.App. 21, 26, 943 P.2d 689 (1997)).
[63] Rebecca K., slip op. at 9.
[64] RCW 7.21.030, "FindingsIntent1998 c 296 §§ 36-39." The legislature misconstrued A.D.F. and K.L., which held only that criminal due process is required before a contempt sanction can include detention without an opportunity to purge.
[65] RCW 7.21.030, "FindingsIntent1998 c 296 §§ 36-39."
[66] Hicks v. Feiock, 485 U.S. 624, 631, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988).
[67] Hicks, 485 U.S. at 636, 108 S.Ct. 1423.
[68] Hicks, 485 U.S. at 633, 108 S.Ct. 1423 (quoting Penfield Co. v. SEC, 330 U.S. 585, 593, 67 S.Ct. 918, 91 L.Ed. 1117 (1947)).
[69] See King v. Department of Soc. & Health Servs., 110 Wash.2d 793, 799, 756 P.2d 1303 (1988).
[70] Accord In re Interest of Rebecca K., 101 Wash. App. 309, 317, 2 P.3d 501 (2000).
[71] State v. Williams, 98 Wash.App. 765, 770, 991 P.2d 107 (2000) (citation omitted).
[72] See, e.g., Moreman v. Butcher, 126 Wash.2d 36, 42-43, 891 P.2d 725 (1995); Rhinevault v. Rhinevault, 91 Wash.App. 688, 694-95, 959 P.2d 687 (1998), review denied, 137 Wash.2d 1017, 978 P.2d 1097 (1999); State v. Miller, 74 Wash. App. 334, 342-43, 873 P.2d 1197 (1994).
[73] See RCW 13.32A.250(3) ("confinement for up to seven days"); RCW 7.21.030(2)(e) ("commitment to juvenile detention for a period of time not to exceed seven days").
[74] See International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); Shillitani v. United States, 384 U.S. 364, 370 n. 6, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966).
[75] RCW 7.21.030, "FindingsIntent1998 c 296 §§ 36-39."
[76] RCW 7.21.010(3).
[77] State v. Buckley, 83 Wash.App. 707, 711, 924 P.2d 40 (1996).
[78] See also King, 110 Wash.2d at 800, 756 P.2d 1303 (contemnor can let himself out simply by "obeying the court order"); Rhinevault, 91 Wash.App. at 694, 959 P.2d 687 (sanction is remedial if contemnor is released upon complying with the court's order); A.D.F., 88 Wash.App. at 26, 943 P.2d 689 (contempt is civil if contemnor is jailed only so long as he fails to comply with [lawful court] order); State v. Heiner, 29 Wash.App. 193, 197, 627 P.2d 983 (1981) (imprisonment under civil contempt statute must include coercive remedy whereby contemnor is imprisoned "only until he or she complies with the relevant court order"); State v. Boatman, 104 Wash.2d 44, 47, 700 P.2d 1152 (1985) (same); State v. Browet, 103 Wash.2d 215, 219, 691 P.2d 571 (1984) (same).
[79] See Rhinevault, 91 Wash.App. at 694-95, 959 P.2d 687.
[80] See Penfield Co. v. SEC, 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947).
[81] There is, however, a discussion of what the court may require by way of proof of inability to comply, as opposed to intent to comply, in King, 110 Wash.2d at 804, 756 P.2d 1303 (contemnor has burden of persuasion as to inability to comply, and evidence must be of a kind court finds credible).
[82] 165 Wis.2d 679, 478 N.W.2d 18 (1992).
[83] Larsen, 478 N.W.2d at 19-20.
[84] Larsen, 478 N.W.2d at 20. We note that the purge condition imposed in Larsen is not available in Washington juvenile status offense cases. Voluntary treatment becomes involuntary when it is the only means to purge contempt. Such a condition would violate RCW 13.32A.196(3), which prohibits courts from ordering "involuntary commitment of a child for substance abuse or mental health treatment." See discussion of In re R.H., infra Section 1.3.
[85] Larsen, 478 N.W.2d at 20-21 (emphasis added).
[86] 87 Wash.App. 177, 940 P.2d 679 (1997), review denied, 134 Wash.2d 1014, 958 P.2d 316 (1998).
[87] Farr, 87 Wash.App. at 188, 940 P.2d 679.
[88] State v. Heiner, 29 Wash.App. 193, 198, 627 P.2d 983 (1981).
[89] Mead Sch. Dist. 354 v. Mead Educ. Ass'n, 85 Wash.2d 278, 287, 534 P.2d 561 (1975).
[90] Mead, 85 Wash.2d at 287-88, 534 P.2d 561.
[91] Mead, 85 Wash.2d at 287-88, 534 P.2d 561.
[92] Under legislation that went into effect on June 8, 2000, a child held in contempt may be confined in a secure facility located in a separate, secure section of a juvenile detention facility. Laws of 2000, ch. 162, §§ 4, 6. However, because secure facility beds are prioritized for runaways, no more than 50% of the beds can be devoted to youth held in contempt. Once the 50% capacity is reached, those youth held in contempt must be moved immediately to the juvenile detention facility. Laws of 2000, ch. 162, § 5.
[93] RCW 13.32A.197(1) provides:

In a disposition hearing, after a finding that a child is a child in need of services or an at-risk youth, the court may adopt the additional orders authorized under this section if it finds that the child involved in those proceedings is not eligible for inpatient treatment for a mental health or substance abuse condition and requires specialized treatment. The court may order that a child be placed in a staff secure facility, other than a crisis residential center, that will provide for the child's participation in a program designed to remedy his or her behavioral difficulties or needs. The court may not enter this order unless, at the disposition hearing, it finds that the placement is clearly necessary to protect the child and that a less restrictive order would be inadequate to protect the child, given the child's age, maturity, propensity to run away from home, and possible future exposure to serious risk should the child run away from home again.
We note that this section has not been briefed in this appeal, and we express no view as to what issues may arise thereunder, but rather emphasize that the legislative scheme contemplates specific remedies for a child's safety, not the court's contempt process.
[94] Mead, 85 Wash.2d at 288, 534 P.2d 561.
[95] See King v. Department of Soc. & Health Servs., 110 Wash.2d 793, 800, 756 P.2d 1303 (1988) (court may not impose criminal contempt sanction unless contemnor is afforded same due process rights extended to other criminal defendants).
[96] King, 110 Wash.2d at 798, 756 P.2d 1303.
[97] State ex. rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971).
[98] State v. Hobble, 126 Wash.2d 283, 292, 892 P.2d 85 (1995).
[99] See In re Marriage of Larsen, 165 Wis.2d 679, 478 N.W.2d 18, 19 (1992).
[100] The court stated, "I am going to impose detention in this matter because of the fact that you're just not staying home, and I've got to try to get you to stay home for your own safety and your own welfare."
[101] See King, 110 Wash.2d at 802, 756 P.2d 1303.
[102] See supra notes 73-75 and accompanying text.
[103] See RCW 28A.225.090(2).
[104] As in other cases here, the court's suspension order did not specify the length of time R.H.'s compliance would be required to constitute a purge of the contempt order. Such an open-ended purge condition creates a situation where the contempt is never effectively purged.
[105] The court stated:

If there is any violation, any truancy, any curfew violation, you go in for 14 days and you will have the opportunity to purge by writing a paper, but we're talking about a novel. You know, we're talking about something that's going to be more than 25 pages by far because I know you can do 25 pages and write something that sounds good and get back out there and violate Orders again.
So, you owe 14 days, it's suspended. You will comply with the Court Orders to the letter and this is on the assumption that you're getting into a program at the first available bed date and if when we come back in this hasn't been done, then the other alternative is detention. Those are your two choices.
[106] See Larsen, 478 N.W.2d at 20.
[107] Our understanding of the facts here is largely derived from the description given by the commissioner at the June 30 contempt hearing.
[108] At the purge hearing, D.M.'s mother objected to D.M.'s placement in a therapeutic foster home as cost prohibitive, as well as unresponsive to her request that the court assert its power to "tell this twelve-year-old she will go home, and she will follow the rules or else, and mean it." In response, the court explained:

[D.M.] has spent more time in detention than any other twelve-year-old that I am aware of on the CHINS caseload, either in front of me or any of the other commissioners who do these cases. And I am sympathetic to your feelings and your fears that she is going to run again and put herself in danger again if she is given the chance to go to foster care. Only time will tell. Certainly her record in the recent past does not give us any cause for easy optimism.
The record reflects that D.M. ran from therapeutic foster care three days later.
[109] See discussion supra Section H.
[110] See supra note 46 and accompanying text.
[111] A child taken into custody on a warrant in a CHINS or ARY case may be detained until the contempt hearing if the court believes the child would not appear, in which case the contempt hearing must take place within 72 hours, excluding Saturdays, Sundays, and holidays. RCW 13.32A.065. This statute was recently amended. See Laws of 2000, ch. 162, § 2.
[112] See RCW 7.21.050(1); State v. Hobble, 126 Wash.2d 283, 892 P.2d 85 (1995).
[113] See Landmark Development, Inc. v. City of Roy, 138 Wash.2d 561, 571, 980 P.2d 1234 (1999) (under doctrine of "expressio unius et exclusio alterius," where a statute specifically designates the things or classes of things upon which it operates, an inference arises that all things or classes of things omitted were done so intentionally).
[114] We see no reason this analysis would not also apply to CHINS contempt proceedings under the same statute, truancy proceedings under RCW 28A.225, and dependency proceedings under 13.34.165.
[115] See State v. Bryant, 78 Wash.App. 805, 812-13, 901 P.2d 1046 (1995) (citing State v. Eppens, 30 Wash.App. 119, 126, 633 P.2d 92 (1981) (considering trial court's oral decision only to extent it was consistent with court's written order)).
[116] Several of the contempt orders at issue in the other cases considered here were also based on unsworn testimony. For example, C.W. and R.H. were found in contempt based only on unsworn testimony. They assign no error to this, however, nor do they contest the contempt allegations.
[117] R.T.'s counsel did not object to the unsworn testimony. We nonetheless review this issue under the manifest constitutional error doctrine. RAP 2.5(a)(3); State v. McDonald, 138 Wash.2d 680, 691, 981 P.2d 443 (1999); State v. Lynn, 67 Wash.App. 339, 346, 835 P.2d 251 (1992).
[118] The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. R.T. also alleges that the use of unsworn testimony violates his right to due process under article 1, section 3 of the Washington Constitution. Because his briefing does not distinguish between the scope of protection afforded under the federal and state due process clauses, we address only the federal claim.
[119] See ER 603.
[120] Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950).
[121] Goldberg v. Kelly, 397 U.S. 254, 268-69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).
[122] Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
[123] Nirk v. City of Kent Civil Serv. Comm'n, 30 Wash.App. 214, 218, 633 P.2d 118 (1981) (citations omitted).
[124] Nirk, 30 Wash.App. at 221, 633 P.2d 118.
[125] Nirk, 30 Wash.App. at 217, 221, 633 P.2d 118.
[126] Nirk, 30 Wash.App. at 220-21, 633 P.2d 118.
[127] Nirk, 30 Wash.App. at 221, 633 P.2d 118.
[128] R.T. also argues that the contempt order violated his right to free speech under the federal and state constitutions because it was based on a prohibition against "verbal abuse." The order of contempt, however, was not based on R.T.'s verbal abuse, but on his curfew violations and his failure to keep his parents informed of his whereabouts. We therefore decline to reach this issue.