[No. 58938-5-I.   Division One.   October 22, 2007.]

*In the Matter of the Interest of* RYAN VAUGHN MOWERY, *Appellant*, VAUGHN MOWERY, *Respondent*.

---

[24] *Badger*, 64 Wn. App. at 908.

[25] 76 Wn. App. 882, 888 P.2d 1211 (1995).

[26] *Recodified as* RCW 9.94A.634.

[27] *Gropper*, 76 Wn. App. at 885-86 (alteration in original).

264

*Gregory C. Link* (of *Washington Appellate Project*), for appellant.

*Matthew Lysne* (of *Sherman Sherman Johnnie & Hoyt, LLP*), for respondent.

¶1 BECKER, J. — A juvenile court resorted to its inherent authority to punish a disobedient juvenile for contempt. At

his father's request, the court sentenced the juvenile unconditionally to 30 days in detention, a criminal sanction. It is well established that a criminal contempt sanction should not be imposed unless it is sought by a disinterested public prosecutor in an action separate from the underlying civil dispute. Washington's criminal contempt statute incorporates these principles of procedural fairness. Because the court did not refer the matter for a statutory prosecution or explain why the statute is inadequate for the purpose of punishing criminal contempt, the sentence must be reversed as an unwarranted use of inherent authority.

¶2 Appellant Ryan Mowery first came to the attention of the juvenile court when he was 16 years old and living with his father, Vaughn Mowery. Finding Ryan difficult to manage, Mr. Mowery sought and obtained an "At Risk Youth" order under RCW 13.32A.191-.198. Ryan disobeyed the order by using drugs and alcohol, staying out late, and being generally disrespectful and disobedient. The juvenile court found Ryan in contempt on several occasions during the course of a year.

¶3 Mr. Mowery filed a petition in January 2006 under the child in need of services statute, RCW 13.32A.140. He alleged that Ryan was engaging in risky and destructive behavior, including substance abuse, property damage, and staying out overnight without permission. The petition was accompanied by a family assessment conducted by Mark Morgenstern, a social worker with the Department of Social and Health Services.[1]

¶4 On March 21, 2006, King County Superior Court Commissioner Nancy Bradburn-Johnson held a fact-finding hearing, granted the petition, and issued an order. The order directed Ryan to move into a group home, follow house rules, attend school, get a drug and alcohol evalua-

---

[1] The social worker, Mr. Morgenstern, attended the hearings without counsel. The Department of Social and Health Services is not a party to the action and has declined to participate in this appeal.

tion, and abstain from using or possessing alcohol, tobacco, and all nonprescribed drugs.

¶5 Ryan moved into the group home, but he violated other terms of the order by continuing to engage in risky behavior associated with substance abuse. His father, joined by Mr. Morgenstern, filed a motion for contempt that was heard on an order to show cause on May 15, 2006. At the hearing, it was undisputed that Ryan was in contempt for violating house rules, most recently by staying out the entire weekend on his own. Mr. Mowery was concerned not only for Ryan's safety but also because his 18th birthday was coming up at the end of the year and he lacked skills. Mr. Mowery recommended that Ryan be directed to do some research on how to get the equivalent of a high school diploma and write a paper explaining how he planned to support himself after turning 18. Mr. Morgenstern recommended a more serious sanction, possibly detention, because he believed Ryan had unresolved substance abuse issues.

¶6 The child-in-need-of-services statute authorizes confinement "for up to seven days" as a civil contempt sanction where a party fails to comply with an order entered under the statute. RCW 13.32A.250(2), (3). The court found Ryan in contempt and ordered seven days of electronic home monitoring, a sanction that Ryan had the ability to terminate before the seven days were up by writing the paper suggested by his father. The court ordered Ryan to submit a sample for urinalysis immediately after the hearing.

¶7 A review hearing followed on June 6, 2006. Ryan had participated in a drug and alcohol assessment and written a paper. Mr. Mowery thought Ryan was still not coming to grips with the problem of how he was going to live once he was 18. He and Mr. Morgenstern both felt that the picture Ryan had presented of himself in the chemical dependency self-assessment was not honest. Mr. Morgenstern said he believed Ryan was providing diluted urine samples, and at least one sample had tested positive for marijuana. The court found that Ryan had not completely purged his

contempt inasmuch as he was still not following house rules at his placement and had not been honest in the drug and alcohol assessment. The court ordered Ryan to participate in a second drug and alcohol evaluation based on information more objective than a self-report. He was also to submit two more samples for urinalysis.

¶8 At the end of the hearing, Commissioner Bradburn-Johnson warned that in the event of a positive or a diluted drug test, the court would consider using "inherent contempt"[2] to order Ryan into detention for a fixed period of time with no opportunity for early release. "What I would be looking at is up to 60 days because, frankly, he's had plenty of chances. And I will remind him, with counsel present, that inherent contempt means there is no purge condition. . . . You will sit and you waste the entire summer. So I'm serious, Ryan."[3] The court informed Ryan that with "inherent contempt," he would have the "rights associated with basically a criminal offender matter," including notice, the right to counsel, the right to a hearing in front of an impartial judicial officer, the right to testify, and the right to call and cross-examine witnesses.[4]

¶9 At the end of June, Ryan ran away from his placement. Found by police "under the influence and 'out of control,' " he was taken to a hospital. Mr. Morgenstern filed a motion for contempt, alleging that Ryan "should be held in inherent contempt" because of his continuing abuse of alcohol or drugs.[5] An initial hearing on the motion was held on July 3. Because Ryan now agreed to enter inpatient treatment, the court continued the matter for a week to permit the details to be worked out.

---

[2] The phrase "inherent contempt," used throughout the proceedings by the court as well as the parties, is confusing. "Making a finding of inherent contempt" appears to have become shorthand in juvenile court for the court's invocation of its inherent authority as a basis for ordering a contemptuous juvenile to be incarcerated for more than the seven days allowed by statute.

[3] Report of Proceedings (June 6, 2006) at 135.

[4] Report of Proceedings (June 6, 2006) at 135-36.

[5] Clerk's Papers at 77 (Order to Show Cause—Contempt, filed June 29, 2006).

¶10 As later reported by Mr. Morgenstern, Ryan completed a new chemical dependency assessment on July 3 and was found to be dependent on alcohol and marijuana. Although there was an inpatient treatment facility that would admit Ryan, the cost was $12,000 and the family's insurance would not cover it. As a result, instead of Ryan's going immediately into treatment as everyone had hoped for, he was returned to his placement. Several hours later, he ran away and did not resurface for two days. He was brought in on a warrant and ordered to remain in detention as a flight risk until the next hearing.[6]

¶11 The hearing on the pending motion for contempt occurred on July 11 before a superior court judge. Mr. Mowery explained the insurance coverage and assessment issues that were still presenting obstacles. Inpatient treatment could be covered by a medical coupon but a bed would likely not be available until October. The court made a finding of contempt and imposed seven days of detention as a civil sanction on the condition that Ryan could be released earlier if a treatment option became available and he agreed to accept it.[7] The issue of "inherent contempt" was reserved for future decision.

¶12 Ryan returned to a group home after serving the sanction. Within a month he was taken to a hospital emergency room for treatment after cutting his hand severely on a broken bottle that he had smashed against a rock. After this incident Mr. Mowery filed the motion for contempt that is at issue in this appeal. The motion alleged that Ryan was not only continuing to engage in alcohol and drug abuse and self-destructive behavior, but that he was also stalling the application process for getting into a treatment facility. Mr. Mowery's motion stated, "This court's sanctions have not been successful in bringing about a change in his behavior.

---

[6] Report of Proceedings (July 6, 2006) at 145-48.

[7] Clerk's Papers at 93-95 (Hr'g, Findings & Order re: Contempt/Purge, filed July 11, 2006); Report of Proceedings (July 11, 2006) at 150-67.

As such, it is requested that the court find Ryan to be in inherent contempt."[8]

¶13 A fact-finding hearing on the motion occurred on September 5, 2006 before Commissioner Bradburn-Johnson. Ryan, Mr. Mowery, and Mr. Morgenstern all testified. Mr. Mowery recommended that the court impose a 30-day detention, "to put Ryan in a safe, stable environment . . . where he would be able to detox and do some real serious self-reflection." Mr. Morgenstern agreed and argued that Ryan was still not "willing to put good faith efforts into getting sober."[9] Ryan opposed the motion. He testified that he was willing to sign the necessary consent forms and go into treatment.

¶14 The court decided that Ryan's history of disobeying court orders called for a finding of "inherent contempt." The court ordered him into immediate detention for 30 days, a fixed term of confinement. The court explained that sending Ryan to detention without a purge condition meant that "basically, it's like a criminal action."

> What I'm looking at is the fact that he absolutely refuses to abide by these court orders. And I'm not talking about signing consent forms or going into inpatient treatment. . . . I'm talking about the file that I have—we're on Contempt Number 4. He has been threatened with inherent contempt before, he was given his rights, he understood what they were, and that process has been followed today. He's had the right to call witnesses, to cross-examine witnesses. He's been represented by an attorney. He's had the right to present information to the Court. And I'm looking at his record here: drug use, running—the drug use is against this court order—bench warrant.

> It's very clear that he has no intention of following this court order, and I have nothing left. I have nothing left to give him to try to twist his arm into following the court order except inherent contempt. And I am going to impose 30 days. . . . This is not coercive. This is inherent. It's also not punitive. It's

---

[8] Clerk's Papers at 97 (Mot. and Order to Set Hr'g regarding ARY/CHINS, filed Aug. 16, 2006).

[9] Report of Proceedings (Sept. 5, 2006) at 208-11.

inherent contempt of the Court to enforce its own orders, and it strictly flows from the fact that Ryan refuses to follow them.

The concern here, I think, is whether a 30-day period will do something that a seven-day has not been able to do. I look at the 30 days as, frankly, a wake-up call for Ryan. . . .

. . . .

My hope is that 30 days will cause him to take a look at things. While I do think that these interim care places are structured in a way that perhaps a family home cannot, I do not believe it is as structured as the place that I'm going to send him to. And I think, frankly, that is what he needs.

I think he needs to understand that you have to follow the orders. . . . I think that there are just a lot of things that a very structured environment might be able to give to Ryan that he cannot get where he is now. And part of this is going to be the realization, I hope, that this is a court order. This Court can impose increasing inherent contempt sanctions.[10]

The written findings entered in support of the 30-day detention order stated that all less restrictive sanctions had been tried, but Ryan was still flouting the court's orders:

1. All less restrictive sanctions have been tried in an effort to coerce Ryan's compliance with this court order. Ryan was, immediately preceding this CHINS action, subject to an ARY order in King County, which he frequently was found to be in contempt for failing to follow it.

2. The court imposes 30 days detention in the hope that a structured setting will provide stability for Ryan and impress upon him that he must follow the court's orders, not flaunt the order. Ryan has engaged in risk taking behavior, including drug use, running away from placement, and severely injuring his right hand from smashing a bottle against a rock, while under the CHINS order.

3. Although Ryan's counsel suggested the court try an alternative to 30 days in detention, it is one that is not available to the court either directly or indirectly, which is inpatient substance abuse treatment. Although a great deal of testimony was centered on Ryan's actions towards and positive

---

[10] Report of Proceedings (Sept. 5, 2006) at 217-19.

attitude about substance abuse inpatient treatment, the court specifically disregards the evidence provided as irrelevant to the finding of inherent contempt.[11]

¶15 On a motion for revision, the superior court found the commissioner's order was properly based on *In re Dependency of A.K.*, 130 Wn. App. 862, 125 P.3d 220 (2005), *review granted*, 158 Wn.2d 1006, 143 P.3d 829 (2006). According to *A.K.*, a juvenile court may use its inherent authority to impose a period of confinement for criminal contempt exceeding the statutory civil sanction of up to seven days so long as the court finds the statutory remedy inadequate to address repeated violations of court orders and explains why a determinate sentence without a purge option "would be more effective." *A.K.*, 130 Wn. App. at 873. In the present case, the superior court ruled that "the record of the court's repeated findings of contempt more than supports a finding of inherent contempt."[12]

¶16 Ryan appeals and asks that the 30-day sanction be set aside.

¶17 Mr. Mowery contends the appeal is moot. Ryan has served the sentence imposed, the original order that he violated has expired, and because he has turned 18 he is no longer subject to the jurisdiction of the juvenile court. We elect to decide Ryan's appeal on the merits because there is the possibility that we can provide effective relief. Ryan incurred a criminal sanction and it is not clear that he will be free of future consequences if it remains on his record. In any event his appeal involves a matter of continuing and substantial public interest. *See In re Interest of M.B.*, 101 Wn. App. 425, 432-33, 3 P.3d 780 (2000).

¶18 Because the superior court did not revise the commissioner's decision, the commissioner's decision stands as the decision of the superior court that is before us for

---

[11] Clerk's Papers at 116 (Addendum to Hr'g, Findings and Order Regarding Contempt for CHINS/ARY, filed Sept. 5, 2006).

[12] Clerk's Papers at 130 (Order on Child's Mot. for Revision, filed Sept. 28, 2006).

review. RCW 2.24.050; *In re Dependency of B.S.S.*, 56 Wn. App. 169, 171, 782 P.2d 1100 (1989).

¶19 It is agreed by the parties that the 30-day sentence imposed on Ryan was criminal in nature rather than coercive. A contempt sanction is coercive, and thus civil in nature, when the contemnor can avoid the sanction by doing something to "purge" the contempt. In such a case the contemnor " 'carries the keys of his prison in his own pocket.' " *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442, 31 S. Ct. 492, 55 L. Ed. 797 (1911)). A contempt sanction is punitive, and thus criminal in nature, when it is imposed to punish completed acts of disobedience without providing an opportunity to purge the contempt. Prosecutions for criminal contempt are designed to serve the limited but fundamental purpose of vindicating the authority of the court so as to preserve respect for the judicial system itself. *Young v. United States ex rel. Vuitton et Fils SA*, 481 U.S. 787, 800, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987).

¶20 The distinction is illustrated by *Mead School District No. 354 v. Mead Education Ass'n*, 85 Wn.2d 278, 287-88, 534 P.2d 561 (1975). Our Supreme Court characterized as criminal a $1,000 fine imposed on a teachers' association for violating an antistrike injunction. The fine was not imposed to compel the teachers to perform a duty owed to the school district. Rather, it was an unconditional penalty imposed to vindicate the authority of the court, "totally independent of any concern of these parties":

> But the punishment imposed by the trial court was absolute: the contemnors were not penalized pending compliance, not sentenced conditionally under order to make plaintiff whole; they were simply sentenced. The trial court's desire was not to force adherence to its present order through duress, but to bolster respect for its future orders by attaching a deterrent sanction to violation. This interest was totally independent of any concern of these parties, and it did not end with the

settlement of their dispute. It survives, and so, then, does the sentence imposed to further it.

*Mead*, 85 Wn.2d at 286.

¶21 The same is true here. The 30-day sentence was punitive in nature, not civil, because the court did not provide Ryan with an opportunity to purge the contempt.

■ ¶22 Washington's criminal contempt statute, RCW 7.21.040, provides that a punitive sanction for contempt of court may be imposed only in a separate action initiated by a public prosecutor.[13] The information or complaint that commences the action must charge contempt and must recite the punitive sanction sought to be imposed. RCW 7.21.040(2)(a). A judge presiding in an action to which the contempt relates may request a public prosecutor to act or may appoint a special counsel to prosecute the action "[i]f required for the administration of justice." RCW 7.21-.040(2)(c). A judge who requests prosecution is disqualified from presiding at the trial. RCW 7.21.040(2)(c).

¶23 The procedure employed by the juvenile court did not comply with the statute. There was no separate criminal action. No public prosecutor was involved and no formal complaint or information was filed. The proceeding was initiated by the motion for contempt filed by Ryan's father in the ongoing civil case under the child-in-need-of-services statute. The motion requested a finding of "inherent contempt." It did not "charge" contempt, it did not expressly identify a punitive sanction as its objective, and it did not state the maximum penalty that could be imposed. The commissioner presided at the hearing, despite having essentially invited the prosecution when she declared in June that she would treat further disobedience as a criminal offense.

¶24 On appeal, Ryan argues on due process grounds that a punitive sanction for contempt can be imposed only in a

---

[13] The single exception is for contempt committed in the courtroom in the presence of the judge. RCW 7.21.040(1), referring to the summary imposition procedures provided in RCW 7.21.050.

separate criminal action initiated by a disinterested prosecutor. Alternatively, he argues that the court violated the separation of powers doctrine by relying on inherent authority rather than following the normal criminal procedure.

## DUE PROCESS

¶25 A court may not use either statutory or inherent power to justify a punitive sanction "unless the contemnor is afforded criminal due process protections, including the safeguards of a criminal trial." *In re M.B.*, 101 Wn. App. at 453; *Bagwell*, 512 U.S. at 826 (holding that prosecutions for serious criminal contempt are subject to the Sixth Amendment right of jury trial, binding upon the states through the due process clause).

¶26 Ryan contends that the requirement for a separate action initiated by a public prosecutor is among the due process protections referred to in *Bagwell*. He cites *Bagwell*'s statement that "criminal contempt sanctions are entitled to full criminal process." *Bagwell*, 512 U.S. at 833. But when examined in context, that statement in *Bagwell* refers to general components of criminal due process such as the reasonable doubt standard, the presumption of innocence, the right to counsel, the right not to testify against oneself, and the right to a public trial before an unbiased judge. We cannot find in *Bagwell* a holding that a separate criminal action initiated by a public prosecutor is a due process requirement.

¶27 This is not to condone the procedure of imposing a criminal contempt sanction as part of a civil action. A sentence for contempt that is "wholly punitive" can be properly imposed "only in a proceeding instituted and tried as for criminal contempt." *Gompers*, 221 U.S. at 444. In *Gompers*, the underlying action was a private suit in equity brought by Bucks Stove & Range Company against the American Federation of Labor. The lower court imposed criminal sanctions on Samuel Gompers and others for

violating an antiboycott injunction. The Supreme Court reversed. Because the underlying cause of action in which Bucks Stove petitioned for relief was civil, only civil relief could be granted. *Gompers*, 221 U.S. at 451. Proceedings for criminal contempt "are between the public and the defendant, and are not a part of the original cause." *Gompers*, 221 U.S. at 445.

> This is not a mere matter of form, for manifestly every citizen, however unlearned in the law, by a mere inspection of the papers in contempt proceedings ought to be able to see whether it was instituted for private litigation or for public prosecution, whether it sought to benefit the complainant or vindicate the court's authority. He should not be left in doubt as to whether relief or punishment was the object in view. He is not only entitled to be informed of the nature of the charge against him, but to know that it is a charge and not a suit. *United States* v. *Cruikshank*, 92 U.S. [(2 Otto)] 542, 559[, 23 L. Ed. 588 (1875)].
>
> . . . .
>
> There was therefore a departure—a variance between the procedure adopted and the punishment imposed, when, in answer to a prayer for remedial relief, in the equity cause, the court imposed a punitive sentence appropriate only to a proceeding at law for criminal contempt. The result was as fundamentally erroneous as if in an action of "A. *vs.* B. for assault and battery," the judgment entered had been that the defendant be confined in prison for twelve months.

*Gompers*, 221 U.S. at 446-49. Setting aside the criminal sentences imposed in the civil case, the Court remanded and directed dismissal of the contempt proceedings instituted by Bucks Stove without prejudice to the power of the lower court to punish contempt in a proper proceeding. *Gompers*, 221 U.S. at 452.

¶28 *Gompers* supports Ryan's request for relief, but it does not mention the due process clause as the basis for its holding. To the extent that Ryan asks us to hold that a separate criminal action is a requirement of due process, he has not cited authority sufficient to compel that conclusion.

¶29 Ryan has similarly failed to establish that a disinterested prosecutor is a due process requirement in crimi-

nal contempt proceedings, although again, he is correct in pointing out that prosecution of criminal contempt by an interested party is a thoroughly disfavored practice. The United States Supreme Court views a disinterested prosecutor as indispensable to the fairness of criminal contempt proceedings.

> Private attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated. As we said in *Gompers*, criminal contempt proceedings arising out of civil litigation "are between the public and the defendant, and are not a part of the original cause." 221 U.S., at 445. The prosecutor is appointed solely to pursue the public interest in vindication of the court's authority. A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution.

*Young*, 481 U.S. at 804. The error of allowing criminal contempt to be pursued by an interested prosecutor is fundamental because the potential conflict of interest "creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." *Young*, 481 U.S. at 811. The Court left no doubt that the rule against such a practice is categorical and a violation cannot be harmless. *Young*, 481 U.S. at 810-14.

¶30 But the Supreme Court in *Young* stopped short of holding that a disinterested prosecutor is a constitutionally mandated due process requirement. Instead, desiring "to avoid the necessity of reaching any constitutional issues," the *Young* Court relied on its supervisory power over the lower federal courts to ensure "that contempt proceedings are conducted in a manner consistent with basic notions of fairness." *Young*, 481 U.S. at 809 n.21, 808.

¶31 We are not bound by the United States Supreme Court's exercise of its supervisory power. *See State v. Bennett*, 161 Wn.2d 303, 311, 165 P.3d 1241 (2007). A requirement for procedural fairness dictated by a higher court in the exercise of its supervisory powers is not

equivalent to a constitutional due process mandate. *Bennett*, 161 Wn.2d at 315-16. Ryan has not briefed the issue whether Washington's appellate courts should exercise supervisory power parallel with the United States Supreme Court. And he has offered no authority other than *Young* as the basis for his argument that a disinterested prosecutor is a due process requirement in criminal contempt proceedings. Therefore, while *Young* tends to support his request for relief, it does not support his argument that he is entitled to relief on due process grounds.

¶32 Ryan also argues that the proceeding violated his right to due process because the decision maker who heard the motion for contempt was not impartial. The extent of his argument is to quote the Supreme Court's observation that the contempt power is uniquely liable to abuse, in part because contumacy " 'often strikes at the most vulnerable and human qualities of a judge's temperament,' and its fusion of legislative, executive, and judicial powers 'summons forth . . . the prospect of the most tyrannical licentiousness.' " *Bagwell*, 512 U.S. at 831 (alteration in original) (internal quotation marks omitted) (quoting *Bloom v. Illinois*, 391 U.S. 194, 202, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968); *Young*, 481 U.S. at 822). This observation is likely the reason why our statute provides that a judge who requests a contempt prosecution is disqualified from presiding at the trial. RCW 7.21.040(2)(c). But here, the court elected to proceed under *its* inherent authority rather than by following the statute. Ryan has not cited authority establishing that a judge who requests a criminal contempt prosecution is presumptively biased for purposes of a due process analysis. And he has not pointed to any indication in the record of actual bias on the part of the commissioner.

¶33 In summary, Ryan has not established that the due process clause calls for a reversal of his sentence.

## INHERENT AUTHORITY

¶34 As an alternative basis for reversal of the 30-day sanction, Ryan contends that the juvenile court erred by using its inherent authority rather than by following normal criminal procedure. He contends the court violated the constitutionally-rooted principle of separation of powers by crafting "a shadow criminal procedure, where the court defined the sanctionable behavior, monitored the juvenile's compliance, adjudicated the case, and imposed a sanction which would not be available in other juvenile offense proceedings."[14] Ryan's father responds that the court's use of its inherent authority to punish for contempt does not violate the principle of separation of powers because it does not invade the prerogatives of the other two branches. He argues that it merely serves the court's institutional interest in having its orders obeyed.

¶35 Whether a court may exercise its inherent authority to impose a sanction for contempt is a question of law that we review de novo. *A.K.*, 130 Wn. App. at 869.

¶36 The doctrine of separation of powers evolved side by side with the constitutional scheme of checks and balances. *In re Salary of Juvenile Dir.*, 87 Wn.2d 232, 552 P.2d 163 (1976). One branch of government may engage in functions that intervene in or overlap with the functions of another branch, so long as it does not undermine the operation of that other branch "or undermine the rule of law which all branches are committed to maintain." *Juvenile Dir.*, 87 Wn.2d at 243. Inherent power is "authority not expressly provided for in the constitution but which is derived from the creation of a separate branch of government and which may be exercised by the branch to protect itself in the performance of its constitutional duties." *Juvenile Dir.*, 87 Wn.2d at 245.

¶37 Because the judiciary must intervene in the operation of the other branches when it engages in consti-

---

[14] Br. of Appellant at 27.

tutional interpretation to decide whether one of the other branches has exceeded its authority, and because it does not have the power of the purse, the judiciary is uniquely "vulnerable to improper checks in the form of reward or retaliation." *Juvenile Dir.*, 87 Wn.2d at 244. The inherent power of the judiciary is derived from its need to protect itself from such improper checks by the other branches. It is used " 'to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed.' " *Juvenile Dir.*, 87 Wn.2d at 245 (quoting *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 53, 274 A.2d 193, *cert. denied*, 402 U.S. 974, 91 S. Ct. 1665, 29 L. Ed. 2d 138 (1971)).

¶38 Courts must limit their incursions into the powers of the other branches to those actually necessary to the purpose of self-protection. "[T]he judiciary's image of impartiality and the concomitant willingness of the public to accept its decisions as those of a fair and disinterested tribunal may be severely damaged" when a court in effect initiates and tries its own lawsuits. *Juvenile Dir.*, 87 Wn.2d at 249. A court must "fully support and clearly state the justifications" for its exercise of inherent power. *Juvenile Dir.*, 87 Wn.2d at 251.

¶39 In *Juvenile Director*, a superior court ordered the county commissioners to raise the salary of the director of juvenile services. On appeal, the Supreme Court concluded that the court was acting outside of its proper realm. Because the superior court failed to demonstrate that the salary raise was truly necessary for self-protection, the court's exercise of its inherent authority to compel funding for court operations "imposed an improper check on the function of the legislative branch of government." *Juvenile Dir.*, 87 Wn.2d at 252.

¶40 Our Supreme Court has been equally firm in insisting on a high level of justification for the use of inherent authority where a court seeks to punish for contempt outside the bounds of the statutes designed for that specific purpose. The legislature may regulate the

court's inherent power to punish for contempt "as long as it does not diminish it so as to render it ineffectual." *Mead*, 85 Wn.2d at 287. In *Mead*, the lower court imposed a punitive fine of $1,000 against striking teachers despite a statutory limit of $100. The Supreme Court refused to uphold the excessive fine as an exercise of inherent power because there was no finding that the statutory limitation impaired the court's contempt power. "Unless the legislatively prescribed procedures and remedies are specifically found inadequate, courts should adhere to them and are not free to create their own." *Mead*, 85 Wn.2d at 288.

¶41 The record in this case does not contain a finding that the statutory procedure is inadequate for the purpose of punishing criminal contempt, nor does it contain evidence that would support such a finding. There is no indication, for example, that the court tried unsuccessfully to refer the matter to a public prosecutor. Referral to a prosecutor "ensures that the court will exercise its inherent power of self-protection only as a last resort," and it also enhances the prospect that investigative activity will be conducted by trained prosecutors. *Young*, 481 U.S. at 801. Referral to a prosecutor ensures a procedure consistent with the concerns identified in *Gompers* and *Young* for the integrity of judicial proceedings.

¶42 Mr. Mowery argues that if a disinterested prosecutor is necessary, he fulfilled the role because he did not have a financial or otherwise self-serving interest in the outcome. The record does not support this view of the case. Mr. Mowery was not acting on behalf of the public interest in vindicating the court's authority. Mr. Mowery was trying to get help for his child. He cannot be characterized as anything other than a private, interested party.

¶43 Mr. Mowery further argues that any self-interested exercise of power by an interested prosecutor is not a concern when the court is exercising its inherent authority because the court can intervene at any time to control or restrain the prosecution. *Young* shows why this argument is

unpersuasive. A prosecutor exercises power independently of the court:

> As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives. A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court.

*Young*, 481 U.S. at 807. A disinterested prosecutor may also evaluate the case independently from the judge who refers it. For example, a disinterested prosecutor might have offered Ryan a plea bargain or recommended a sanction more proportional to a standard range disposition for a juvenile offense of comparable seriousness. We therefore reject the argument that court supervision can cure the absence of a disinterested prosecutor. Because the statute assures the involvement of a disinterested prosecutor, it is not only adequate but superior to the procedure used by the court below in the exercise of its inherent authority.

¶44 Instead of focusing on the adequacy of the statutory scheme, the commissioner articulated other justifications for the use of inherent power. The commissioner found that "[a]ll less restrictive sanctions have been tried in an effort to coerce Ryan's compliance with this court order."[15] This is not a satisfactory rationale for punishing contempt through a nonstatutory procedure. It appears to be derived from *State v. Norlund*, 31 Wn. App. 725, 729, 644 P.2d 724 (1982), cited in *A.K.*, 130 Wn. App. at 868-69. "Only under the most

---

[15] Clerk's Papers at 116.

egregious circumstances should the juvenile court exercise its contempt power to incarcerate a status offender in a secure facility. If such action is necessary, the record should demonstrate that all less restrictive alternatives have failed." *Norlund,* 31 Wn. App. at 729. *Norlund,* however, was reviewing coercive sanctions. It does not apply to punitive sanctions.

¶45 Mr. Mowery argues that the court's use of inherent power was consistent with *M.B.* In *M.B.*, we said that "[o]n the rare occasion when a juvenile court decides it must disregard the statutory seven-day limit and resort to its inherent contempt powers, the court must enter a finding as to why the statutory remedy is inadequate and articulate a reasonable basis for believing why some other specific period of detention will achieve what seven days will not." *M.B.*, 101 Wn. App. at 453. But here again, in *M.B.* we were speaking of the statutory authorization for seven days in detention, which is a coercive remedy designed to "achieve" compliance with the order. In this case, the court imposed a punitive sanction, not a coercive remedy.

¶46 When coercive remedies are ineffective to achieve compliance with the underlying order, the court may be justified in referring the matter for a criminal contempt prosecution under the criminal contempt statute. But the ineffectiveness of coercive remedies is not a proper rationale for avoiding the constraints of the criminal contempt statute. Courts may not deviate from the statutory scheme "unless the statutory powers are in some specific way inadequate. Otherwise, a resort to inherent powers effectively nullifies the statutes." *M.B.*, 101 Wn. App. at 452 (footnote omitted).

¶47 A secondary rationale for the use of inherent power, at least from Mr. Mowery's viewpoint, was the perceived need to incarcerate Ryan for his own good. The commissioner, too, expressed the hope that the "structured setting" of jail would provide "stability" for Ryan.

¶48 The desire to protect a juvenile from the risks of the street by locking him up is not an appropriate rationale for

invoking inherent authority to punish for contempt. We disagree with the statement in *A.K.* that punitive incarceration of juveniles is justified by "the juvenile court's determination that the statutory sanctions could not meet their needs." *A.K.*, 130 Wn. App. at 886. Even if the jailing of juveniles can be said to meet their needs, it does not serve the court's need to protect itself from improper checks by the other two branches of government. Rather, it intrudes on the prerogatives of the other branches. It is up to the legislature and executive branch, not the judiciary, to decide whether to develop an expensive program of involuntary confinement to address alcoholism, drug abuse, and other self-destructive behavior by juveniles. Within constitutional limits, the extent to which government should intervene in the lives of children and families in conflict is quintessentially for the legislature to define. We said as much in *M.B.* when discussing the risks of using inherent power to coerce compliance with court orders:

> The risks of exercising inherent power to deviate from a comprehensive statutory scheme may be many. There is a significant danger, for example, that the discretionary use of inherent contempt power to deal with runaways will become a systematic response. Such a practice increases the risk of overcrowding as well as the risk that runaways will be housed with criminal offenders. Concerns with the fiscal and administrative consequences of indefinite incarceration were likely a motivation for the legislature's decision to place a statutory limit of seven days on detention for contempt.

*M.B.*, 101 Wn. App. at 452.

¶49 In summary, the juvenile court did not fully support and clearly state an appropriate justification for its exercise of inherent power to punish Ryan for contempt. Under *Mead*, the court should have followed the statute and referred the matter to a disinterested public prosecutor. The order of detention is an improper and untenable use of

the court's inherent power and must be reversed as a violation of the doctrine of separation of powers.[16]

¶50 Reversed.

COLEMAN and COX, JJ., concur.

---

[16] Ryan also argues that the order violated his constitutional right to be free from cruel and unusual punishment because it punished him for being an addict rather than for his conduct. Because we reverse on separation of powers grounds, we do not reach this argument.